ARMCO INC., Georgetown Steel Corp., and Raritan River Steel Co., Plaintiffs,

v.

UNITED STATES of America, Defendant,

and

Amalgamated Steel Mills, Berhad, Defendant–Intervenor.

Court No. 88–05–00381.

United States Court of International Trade.

March 29, 1990.

See also 712 F.Supp. 214.

Wiley, Rein & Fielding (Charles Owen Verrill, Jr. and Alan H. Price), Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (Velta A. Melnbrencis), New York City, for defendant.

Willkie, Farr & Gallagher (Christopher A. Dunn), Washington, D.C., for defendant-intervenor.

## OPINION

MUSGRAVE, Judge.

## BACKGROUND

The plaintiffs in this action are United States manufacturers of carbon steel wire rod. The defendant-intervenor Amalgamated Steel Mills, Berhad ("A.S.M.") is a Malaysian company that manufacturers carbon steel wire rod and has at times exported this product to the United States. At the time of the investigation in this case it was the only Malaysian producer of steel wire rod. The plaintiffs filed a countervailing duty petition with the Department of Commerce ("Department") on September 3, 1987 in which they asserted that Malaysian companies exporting carbon steel wire rod to the United States received from the Malaysian Government "bounties or grants" with relation to those exports, within the meaning of the United States countervailing duty statute, 19 U.S.C. § 1303 (1988). In its Final Affirmative Countervailing Duty Determination,[1] published on April 18, 1988, the plaintiffs as conferring countervailable benefits did confer such benefits, that some of the programs did not, and that some of the programs were of a countervailable nature but were not used by Malaysian producers or exporters of carbon steel wire rod during the relevant period of the Department's investigation (calendar year 1986). The Department derived a net rate of the countervailable subsidies received by Malaysian producers and exporters of carbon steel wire rod of 17.71 percent *ad valorem.*

In the present action before this Court, the plaintiffs contest two specific negative findings made by the Department with regard to programs included by the Department in the latter two of these three categories. First, the plaintiffs challenge the Department's finding that during the period of the Department's investigation, no Malaysian producers of carbon steel wire rod used benefits available from the Malaysian Government under Section 29 of the Investment Incentives Act of 1968, as amended in 1983 ("Section 29"). Section 29, at all times relevant in this action, made available to most Malaysian companies an abatement of Malaysian taxes in the amount of five percent of the f.o.b. value of a company's export revenues in a taxable year. Second, the plaintiffs contest the Department's determination that tax depreciation allowances for plant facilities available under Section 3 of the Investment Act of 1967, which allowances the plaintiffs allege to exceed the useful lives of the assets depreciated, did not confer countervailable bounties or grants. The plaintiffs assert A.S.M. received benefits under these two programs that should have been found by the Department to be countervailable. The plaintiffs move this Court to reverse these two negative findings of the Department and to remand this case to the Department for a redetermination.

### Section 29 Tax Abatements

According to the Department's Preliminary Negative Countervailing Duty Determination in this matter,[2] Section 29 of the Malaysian Investment Incentives Act of 1968 (hereinafter Section 29), by an amendment effective in 1984, made available to most Malaysian manufacturing companies a flat deduction from taxable income of five percent of the f.o.b. value of export revenues in a taxable year. This deduction applied to tax returns filed in the assessment years 1985 and 1986. The Promotion of Investments Act of 1986, effective Janu-

---

1. 53 Fed.Reg. 13,303 (1988). The Commerce Department's notice of its Initiation of Countervailing Duty Investigation in this case is printed at 52 Fed.Reg. 36,601 (1987). The Department's Preliminary Negative Countervailing Duty De- termination is printed at 53 Fed.Reg. 3413 (1988).

2. 53 Fed.Reg. at 3415.

ary 1, 1986, repealed the Investment Incentives Act of 1968, retaining the tax abatement of five percent of the amount of export sales but limiting the availability of the abatement to resident trading and agricultural companies (as opposed, presumably, to manufacturing companies).

The source of the dispute between the plaintiffs and the defendants as to whether the defendant A.S.M. received countervailable benefits under Section 29 lies partly in the methods of tax assessment and payment in Malaysia and partly in the corporate structure and operations of A.S.M. and its subsidiaries. Pursuant to the Malaysian tax methodology, Malaysian companies pay Malaysian income taxes in the year after the fiscal year in which the underlying income was earned. Correspondingly, the companies also receive any tax credits or deductions in the later year. Angkasa Marketing, Berhad ("Angkasa"), a wholly-owned marketing subsidiary of A.S.M., exported to the United States in 1984 and 1985 wire rod manufactured by the parent company A.S.M. At the time of the events in this case, Angkasa was the only Malaysian exporter to the United States of steel wire rod. In 1986, the year of the Department's investigation at issue, Angkasa claimed the Section 29 tax abatement, based on its 1985 exports to the United States, against Malaysian taxes on its 1985 income. At the beginning of 1986, the activity of exporting the wire rod products was transferred from Angkasa back to the parent A.S.M.

In March 1986 the plaintiffs in the present action filed a countervailing duty complaint concerning these tax benefits claimed by Angkasa against the taxes it paid in 1985 on its 1984 income. In its preliminary determination of this complaint, the Department found that the Section 29 benefits received by Angkasa on its 1985 returns were countervailable, but that because of Angkasa's particular tax and income situation in 1985, the benefits actually realized were not sufficiently large to warrant the imposition of countervailing duties on Angkasa's exports to the United States. 51 Fed.Reg. 20,324, 20,326 (1986).

On September 3, 1987 the plaintiffs filed with the Department the countervailing duty petition at issue in the present case. Along with the other Malaysian Government programs alleged in their petition to be countervailable, the plaintiffs repeated their request for an imposition of countervailing duties on Angkasa's exports to the United States on the basis of benefits received by Angkasa under Section 29, this time against its 1986 taxes paid on its 1985 income. While finding that several of the programs implicated by the plaintiffs warranted the imposition of countervailing duties, the Department again refused to impose such duties on the benefits under Section 29 which were previously found to be of a countervailable kind; this time, however, the Department's reasoning was different. In its preliminary determination, the Department decided that the Section 29 benefits received by Angkasa on its 1985 imports were not countervailable, because by the time of the investigation at issue and the review period of this investigation —1986—Angkasa was no longer exporting to the United States, this task having been shifted—advantageously—to the parent A.S.M. before the beginning of the review period. Because of the "tax-lag" system of revenue collection used by the Malaysian Government, then,—collecting taxes on one year's income in the following year—the Department found that the export subsidy received by Angkasa from Section 29 benefits, which benefits had previously been determined to be of a countervailable nature, was not countervailable.

After this preliminary negative determination with regard to the Section 29 benefits, the plaintiffs argued before the Department that the avowedly countervailable benefits should not escape countervailing duties merely because of the times of accrual and assessment of income taxes under the Malaysian revenue collection methodology; rather, the plaintiffs asserted, duties should be levied upon exports to the United States of carbon steel wire rod by the parent company A.S.M. The plaintiffs argued that A.S.M. owns 100 percent of Angkasa, that the two companies share the same board of directors and the same gen-

eral manager, that the financial results of Angkasa are consolidated with those of A.S.M., and that A.S.M. controls Angkasa's export activities (as evidenced by the transfer of export responsibilities from Angkasa to A.S.M. at end of 1985). These assertions are not contested. The plaintiffs asserted, and assert here, that because of the intimacy of this corporate relationship between A.S.M. and Angkasa, the avowedly countervailable subsidy conceded to have been received by Angkasa in 1986 should be imputed to A.S.M. The plaintiffs reason that as the 100 percent owner of Angkasa, A.S.M. theoretically and practically benefits from any bounties or grants received by Angkasa, and that countervailing duties should therefore be imposed on exports to the United States by A.S.M. of the same product for which Angkasa received the admittedly countervailable benefits at issue. According to the plaintiffs, the ability of A.S.M. to shift, for transparently obvious reasons, the export function from the subsidiary to the parent confirms this control and the use of "benefits" of whatever kind. In making this argument, the plaintiffs emphasize the express language of the U.S. countervailing duty statute, 19 U.S.C. § 1303(a)(1), which states that "there shall be levied and paid" a countervailing duty on imports of a product "whenever any country ... shall pay or bestow, *directly or indirectly*, any bounty or grant upon the manufacture or production or export" of that product. (Emphasis added.) The plaintiffs argue that the use by Congress of the words "directly or indirectly" clearly indicates that the scope of this countervailing duty provision was intended to cover situations such as the present one involving A.S.M. and Angkasa.

In rejecting the plaintiffs' argument, the Department emphasized the fact that A.S.M. and Angkasa file separate income tax returns on which they report separate incomes. The Department further stated in its Final Determination that there was "no evidence that Angkasa passes on a benefit that it receives on its income to A.S.M." 53 Fed.Reg. at 13,308. The Final Determination also recites that Malaysian

law prohibits the transfer of income tax benefits from one company to another.

In addition to these subjective factors, the Department stated that it "has not normally considered a company and its wholly-owned subsidiaries as one company for purposes of determining countervailing duties." *Id.* The Department conceded that the plaintiffs "have raised the very troubling prospect of a subsidiary and its parents evading duties by alternating the years in which they apply for tax benefits or in which they export to the United States." *Id.* Nevertheless, the Department saw "no evidence of such a pattern developing between A.S.M. and Angkasa." *Id.* The Department pledged itself to monitor the two companies' activities, and promised that if Angkasa resumed exporting wire rod to the United States, any export subsidies that Angkasa received "would be reflected in any countervailing duties assessed." *Id.*

### Depreciation Allowances

Section 3, paragraphs 9–12, of Malaysia's Income Tax Act of 1967 allows against taxable business income a fixed initial depreciation allowance of 20 percent of the amount of a "qualifying plant expenditure" made "for the purpose of a business". In addition to this fixed initial allowance, there are available to Malaysian companies, under paragraphs 14–24 of section 3, annual depreciation allowances of varying percentages for various business expenditures. These annual allowances vary in percentage according to the useful life, as determined by the Malaysian Government, of the particular asset on which the qualifying expenditure was made. The list of asset categories and corresponding depreciation rates are set out in Schedules A and B of the Income Tax (Qualifying Plant Annual Allowances) (Amendment) Rules of 1980, effective in the 1981 and subsequent years of assessment. Both the initial and the annual allowances are taken in the first year of a qualifying recurring plant expenditure; thereafter, the annual allowances are taken yearly on a straight-line basis, not to exceed 100 percent of the value of the underlying asset.

The plaintiffs contended before the Department, and maintain here, that wire rod producers in Malaysia received countervailable benefits because, the plaintiffs contend, the annual depreciation rate for wire production facilities is not related to the useful life of these assets and is greater than the allowance for other steel manufacturing facilities and for most other industries in Malaysia. The plaintiffs assert that with the combined initial and annual depreciation allowances it is possible to completely depreciate steel wire rod production facilities in six years. The plaintiffs further assert that the Department has in prior investigations used a fifteen-year period as the useful life of steel manufacturing facilities, and that there is not sufficient evidence or verification in the administrative record to show that the useful life of A.S.M.'s wire rod production facilities was six years or that it is less than the fifteen-year standard period.

The Department asserts that the depreciation percentages contested by the plaintiffs in this case are the standard depreciation allowances permitted in Malaysia, and that the allowances are not tied to specific industries (as opposed to types of assets), such as export industries. Contrary to the plaintiff's position, the Department argues that there exists in the record no *affirmative* evidence showing that the six-year period of depreciation did *not* reflect the useful life of the assets at issue. On this basis (of not having proved a negative premise), the Department concluded that the depreciation allowances were not excessive, and therefore determined that the initial and annual allowances were not countervailable.

## DISCUSSION

### Standard of Review

The standards of review applicable to review by the Court of International Trade of agency determinations in antidumping and countervailing duty cases are set out in 19 U.S.C. § 1516a(b)(1) (1988). The Court may disturb an interlocutory agency decision in these areas only if the Court finds that the decision was arbitrary, capricious, an abuse of the agency's discretion, or otherwise not in accordance with law. For final agency determinations, the type of action under review here, the statute provides, as a somewhat lesser standard, that such a determination shall be held unlawful if the Court finds it to be "unsupported by substantial evidence on the record or otherwise not in accordance with law." While it is less stringent than the standard of review for interlocutory decisions, the "substantial evidence" standard for final determinations nevertheless provides a significant degree of discretion for the administering agency. The Supreme Court has stated that the evidence required to support an agency's decision under this standard is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[;]" *Universal Camera v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951); "enough [evidence] to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact...." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939).

In enacting the 1979 Trade Agreements Act and the 1984 Trade and Tariff Act which established the above statutory standards of review in antidumping and countervailing duty cases, Congress evidenced an intent to grant greater flexibility to the administering agencies so as to make less difficult and less lengthy the application and enforcement of the laws in these areas. This is particularly true regarding the antidumping laws. The Senate Report accompanying the 1979 Act states that a "major objective" of the Act was to reduce the length of antidumping investigations. S.Rep. No. 249, 96th Cong., 1st Sess. at 75, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 461. The Court of Appeals for the Federal Circuit has stated that reviewing courts should give "tremendous deference" to the findings made by an agency "in administering the antidumping law." *Smith Corona Grp. v. United States*, 713 F.2d 1568, 1571 (1983).

In the countervailing duty area, as well, the substantial evidence standard requires courts generally to defer the methods and findings of an agency's investigation. Nevertheless, while it is not for the Court to substitute its judgment for the agency's with regard to evidence that the agency used or the methods that the agency used, the Court must not permit an agency in the exercise of that discretion to ignore or frustrate the intent of Congress as expressed in substantive legislation that the agency is charged with administering. In the imperative language of the statute delineating standards of review, the Court "shall" ensure that the determination, made within the agency's broad discretion, is supported by substantial evidence and is otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B); *Ceramica Regiomontana v. United States*, 10 CIT 399, 404–5, 636 F.Supp. 961, 965–6 (1980), *aff'd* 810 F.2d 1137 (Fed.Cir.1987); *Cabot Corp. v. United States*, 12 CIT ——, 694 F.Supp. 949 (1988). *See FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981) (courts must reject agency's statutory interpretations that "are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement."); *SEC v. Sloan*, 436 U.S. 103, 118–119, 98 S.Ct. 1702, 1711–12, 56 L.Ed.2d 148 (1978). Were the scope of the discretion accorded to the agency unlimited, there would be no point in the (statutorily mandated) judicial review here undertaken.

### Section 29 Benefits

The dispute in this case over the Section 29 benefits turns on the question whether or not these benefits received by Angkasa should be attributed to Angkasa's parent A.S.M. The plaintiffs argue for such an attribution, emphasizing the fact that a benefit under Section 29 was conceded to have been bestowed upon Angkasa, the closeness of the relationship between the two companies, and the policy behind the U.S. countervailing duty statute, evident in its express language, that when goods exported to the United States are unfairly subsidized by foreign governments, those goods should be subjected to countervailing duties upon entry into the United States. The defendants oppose such an attribution, citing a purported long-standing policy of the U.S. Commerce Department of refraining from treating related companies as a single entity for countervailing duty purposes. The defendants also rely on their assertions that Angkasa and A.S.M. filed separate income tax returns, that there is no evidence that Angkasa in fact passed on to A.S.M. benefits that Angkasa received under Section 29, and that in any event Malaysian law prohibits the transfer of income tax benefits between companies.

The defendant states,

In the past, Commerce has interpreted the statutory language contained in 19 U.S.C. § 1303(a) to mean that the payment or bestowal of a bounty, grant or subsidy upon a party not under investigation does not automatically benefit (and does not automatically result in the payment or bestowal of a bounty, grant or subsidy upon) a party under investigation merely because the two parties are related.

Defendant's Brief at 15. The defendant cites in support of its proposition several previous determinations of the Department in countervailing duty cases. In *Operators for Jalousie and Awning Windows from El Salvador*, 51 Fed.Reg. 41,516 (1986), as in the present case, the petitioners argued that export tax benefits received by one company, DIE CAST, should be attributed to its sibling company, IMSA, because the firms were under the common ownership of another, parent company. Although the Department did engage in such an attribution in its preliminary determination, it declined the petitioners' request that it do so in its final determination. The Department refused because it determined that no transfer of benefits occurred in fact and because of its conclusion that El Salvador law prohibited the transfer of benefits between the two companies.

Unlike the two sibling companies involved in *El Salvador*, the defendant companies in the present case are a parent and

a subsidiary of which the parent owns 100 percent. Thus, the relationship here between the recipient of the benefits—the subsidiary—and the company to which the benefits are sought to be attributed—the parent—is more direct than the relationship between the corresponding companies in the *El Salvador* case. In the *El Salvador* case, the attribution to the second subsidiary of benefits received by the first subsidiary would have to be effected indirectly, through the parent company, while in the instant case the benefits are sought to be attributed directly from the recipient subsidiary to the parent company that owns this subsidiary entirely; no third company conduit is present or necessary here. The benefit to the subsidiary accrues immediately to the parent corporation (as an enhancement of its asset, the subsidiary), and the benefit is presumably reflected in the parent corporation's consolidated financial statements.

The defendant also cites *Low–Fuming Brazing Copper Rod and Wire from South Africa,* 50 Fed.Reg. 31,642 (1985), in which petitioners contested the Department's failure to investigate, in response to the petitioners' complaint, whether one of the South African companies included in the investigation (McKechnie) had engaged in profit and loss shifting with "related" companies and whether McKechnie received from the related companies Government subsidies granted to those other companies. The Department refused to investigate these allegations, because of the Department's findings, like its findings in the present case, that the foreign companies filed separate tax returns and that, in any event, under the laws of the foreign government involved, there South Africa, "companies are not allowed to consolidate for tax purposes." *Id.* at 31,645. Additionally, the Department stated in that case,

> We also found at verification that none of the companies with an ownership interest in McKechnie are owned, in whole or in part by the Government of South Africa. Absent evidence of government ownership or governmental direction, it is our standard practice not to investi-

gate financial transactions between related entities because we view these merely as intracorporate transfers of funds.
*Id.*

Similarly, in the present case the Department found that A.S.M. and Angkasa at times relevant in this case filed separate income tax returns and that Malaysian law did not permit the transfer of income tax benefits from one company to another. Also, neither A.S.M. nor Angkasa was found to be owned or directed by the Malaysian Government.

It is not clear, however, that the "related" companies in the *South Africa* case were as directly related as are the parent and wholly-owned subsidiary involved here. Moreover, unlike the petitioners in *South Africa,* who alleged actual, specific transfers between the related companies there (the shifting of profits and losses), the present plaintiffs do not base their complaint on the identification of actual, tangible transfers from Angkasa to A.S.M. of all or parts of the Section 29 benefits acknowledged to have been received by Angkasa; rather, they argue that in view of the specific status of A.S.M. as 100 percent owner of Angkasa, and its admitted—and demonstrated—extensive control over the decisions and operations of the subsidiary, the parent should not be allowed, after routing wrongfully subsidized exports to the United States through its subsidiary, to then switch the responsibility for such exports to itself just as the Department's investigation begins, so that at the very time the subsidiary is reaping the benefits of the illegal subsidies under the Malaysian tax system it will not be subjected to the Department's investigation of those very subsidies. In fact, the Commerce Department in *South Africa* not only refused to consider the attribution to the foreign company at issue of benefits allegedly received by "related" companies, it also declined even to investigate whether government subsidies were in fact received by the "related" companies. In the present case, by contrast, the Department determined that the benefits received by Angkasa *were* countervailable benefits; the only question here

is whether they should be attributed to the parent which has taken over the exporting activity, so that duties can be levied on the subsidized exports. For these reasons, the Court does not find significant precedential value, for the present case, in the Department's *South Africa* determination.

Finally, the defendant cites *Carbon Structural Shapes from Luxembourg*, 47 Fed.Reg. 39,364 (1982). In *Luxembourg*, as in *El Salvador*, the Department initially took into account the relatedness of two foreign companies involved, but subsequently disregarded this consideration. In its countervailing duty questionnaires sent to respondent companies in Luxembourg, the Department specified that the respondent companies were to supply the requested information both about themselves and also about "all companies in which the respondent company held 20 percent or more of the voting interest." *Id.* at 39,365. A respondent company at issue in the investigation, Acieries Reunies de Burbach–Eich–Dudelange S.A. (ARBED) was known by the Department to own at least 25.09 percent of another Luxembourg company, Metallurgique et Miniere de Rodange–Athus S.A. (MMR–A). Both companies produced and exported to the United States the product at issue. In its preliminary determination, the Department treated ARBED and MMR–A as a single entity: benefits received by the subsidiary MMR–A were considered to have been received by the parent ARBED as well, and a common subsidy rate was applied. Later in the investigation, however, the Department decided not to consider the parent and subsidiary in combination for purposes of the final determination. Although the Department had determined that ARBED's percentage of ownership of MMR–A was closer to 40 percent, it retreated from its earlier consideration of the companies in combination, because of its three following findings: that the companies maintained separate financial structures; that government benefits received by MMR–A "[were] separate from" those received by ARBED and were "not allowed to pass through MMR–A to ARBED in any tangible fashion," with the exception of benefits granted under one specific program; and that the fact that ARBED had made loans to and investments in MMR–A was "proof that no financial benefits have yet accrued to ARBED from MMR–A subsidies." *Id.*

As with the other cited determinations, the Department's determination in *Luxembourg* is not strongly instructive in the present case. Again in *Luxembourg*, the investigation did not concern the question of attribution of countervailable benefits directly between a parent and its wholly-owned subsidiary where the parent had exercised substantial control over its subsidiary's operations, particularly its export operations. Also, the petitioners' complaint in *Luxembourg* turned more on the question of whether there were actual transfers between the two foreign companies of specific benefit funds in a "tangible fashion"; the Department found that such transfers did not occur, and consequently it declined to treat the transactions between the two companies as if they did.

The defendant also cites the Department's determination in *Low–Fuming Brazing Copper Rod and Wire from New Zealand*, 50 Fed.Reg. 31,638 (1985), noting that the Department there declined to attribute tax credits received by a subsidiary to a company that owned 60 percent of the subsidiary or to another subsidiary of the second company. In that case, the Department determined that the second subsidiary in fact *had* received countervailable benefits, irrespective of any attributions from the first subsidiary. The second subsidiary was mentioned only at the end of a four-and-one-half page discussion, where the Department agreed that the tax credits received by the first subsidiary would not be attributed to the other two companies with respect to the product under investigation because the first subsidiary did not even produce the product. This Court will not discuss the *New Zealand* determination, then, other than to note its irrelevance to the present action.

The defendant cites these determinations to support its proposition that it has in the past so interpreted the countervailing duty statute that the bestowal of a subsidy upon

one company "does not automatically benefit (and does not automatically result in the ... bestowal of a ... subsidy upon)" another company "merely because the two parties are related." Defendant's Brief at 15. The Court does not find this proposition exceptionable; it also does not believe that the proposition is dispositive of the issues in this case concerning Section 29 benefits. The plaintiffs do not here contend for a blanket policy whereby whenever any foreign company receives any subsidy benefits, these benefits "automatically" will be attributed to all other companies "related" to the recipient. Rather, the plaintiffs argue that *under the particular facts of this case*, it is essential that duties be levied upon A.S.M.'s exports, in order to countervail the Section 29 benefits received by its wholly-owned and controlled subsidiary, and to avoid circumvention of the clear intent of Congress expressed in the countervailing duty statute.

The determinations cited by the defendant do not show a blanket policy of automatically *not* attributing benefits received by one company to a closely related company. Instead, these determinations turn essentially upon the Department's findings in particular cases that no specific benefits were physically or tangibly transferred between companies of varying degrees of relatedness. In other cases the Department *has* attributed benefits received by one company to a related company.

The parties are in dispute over the meaning for purposes of the present case of the Department's determination in *Brass Sheet and Strip From France*, 52 Fed.Reg. 1218 (1987). In that case, the Department found that subsidies provided by the French Government to a French company, Pechiney, which company did not export during the period of investigation, benefitted a subsidiary of Pechiney, Trefimetaux. Pechiney was a non-manufacturing holding company of which the French Government owned 85 percent of the voting stock. The French Government provided funds to Pechiney from 1982 through 1985 in the form of direct equity investment, conversion of debt into equity, and subordinated shareholder investments. Pechiney provided

various financial assistance to Trefimetaux through equity infusions, loans, and other funds. Although the French Government provided no investments or funds directly to Trefimetaux, the Department determined that the subsidies the French Government had provided to Pechiney, which as a holding company did not export products, also benefitted and were attributable to Trefimetaux, which did export during the relevant period. The Department made this determination because Pechiney owned Trefimetaux and made the various transfers to the subsidiary when such investments were not commercially justifiable given the financial health of Trefimetaux. The Department made this determination, moreover, notwithstanding the fact that the two companies paid taxes separately and maintained separate financial records.

The plaintiffs consider this determination to be clear precedential support for their contention that the government subsidies granted to Angkasa should be attributed to the parent A.S.M. which benefitted from these subsidies by reason of its complete ownership of Angkasa. While the direction of attribution in *Brass Sheet*, from parent to subsidiary, was the reverse of the subsidiary-to-parent attribution that they seek here, the plaintiffs regard *Brass Sheet* as support for their proposition that corporate formalities should not be allowed to obscure the fact that subsidies have been bestowed, even if indirectly, upon goods being exported to the United States, and that these goods should therefore be subjected to countervailing duties.

The defendant emphasizes as a primary distinction between *Brass Sheet* and the present case the fact that the parent company in *Brass Sheet* was owned in substantial measure by the French Government, while neither Angkasa nor A.S.M. was owned by the Malaysian Government. The defendant states additionally,

the funds provided by the French government to Pechiney represented the only funds that Trefimetaux, an unequityworthy firm, could draw upon to support is operations. By contrast, if Angkasa

transferred the benefit provided by the Malaysian Government to A.S.M., it would violate Malaysian law.

Defendant's Brief at 21.

From this analysis, the defendant asserts that the evidence in the present case requires an outcome here that is "consistent with, but unmistakably opposite from, that reached by Commerce in *Brass Sheet*." *Id.*

The Court does not consider the *Brass Sheet* determination to have such direct and decisive precedential force in the present case as the plaintiffs contend. The attribution in *Brass Sheet* was made from the parent to the subsidiary, because of transfers made by the former to the latter that were found by the Department not to be commercially justifiable; therefore, those transfers were deemed to constitute a passage to the subsidiary of funds received by the parent directly from the French Government. In contrast to that situation, the present plaintiffs seek an attribution in the opposite direction—from the subsidiary Angkasa to the parent A.S. M.—, and they seek this not because of actual, tangible transfers from the former to the latter, but because of the *status of the subsidiary* which received the subsidies as a company *wholly-owned and controlled by the parent.*

On the other hand, the Court finds unconvincing the defendants' distinction of the *Brass Sheet* determination as dictating an opposite result in this case. The fact that, as found by the Department in *Brass Sheet,* without the funds provided to Trefimetaux by the French Government through Pechiney, Trefimetaux "would not have had certain financial assistance available to it" does not appear to have been of great importance to the Department's determination in *Brass Sheet:* the Department simply found that Pechiney received funds from the French Government, that it passed these on to Trefimetaux directly through unjustifiable transfers, and that Trefimetaux's exports were thus wrongfully subsidized. It does not seem that this determination would, or should, have been different if Trefimetaux would have been able to "draw upon" some funds from

sources other than Pechiney. Therefore, the defendant's second distinction is deemed to be of little significance in the present case.

The Department stated in *Brass Sheet* that to allow the parent to pass the benefits to the subsidiary uncountervailed in that case *"would permit our countervailing duty law to be circumvented."* 52 Fed.Reg. at 1222 (emphasis added). This seems to have been the critical consideration in *Brass Sheet.* In any event, it *should* be a fundamental consideration in the present and all countervailing cases: the attention in such cases should be focused upon the question whether exports to the United States have been unfairly subsidized, as envisioned by Congress when it enacted the countervailing duty legislation. This legislation should not be circumvented by corporate formalities or maneuvering.

The countervailing duty legislation is not limited in applicability only to subsidies that are granted to an exporter directly by a foreign government or a government-owned company. Rather, the statute by its express terms extends to *"any* bounty or grant" that is bestowed *"directly or indirectly"* upon the production or export of *"any* article" entering the United States from a relevant country. The phrase "directly or indirectly" has been included in its present form in the countervailing duty law since before the Tariff Act of 1913. Shortly after the enactment of the 1913 Act, the Court of Customs Appeals wrote as follows regarding the section of that Act containing the phrases "any bounty or grant" and "directly or indirectly":

> [This language's] plain, explicit, and unequivocal purpose is: Whenever a foreign power or dependency or any political subdivision of a government shall give any aid or advantage to exporters of goods imported into this country therefrom whereby they may be sold for less in competition with our domestic goods, to that extent by this paragraph the duties fixed in the schedule of the act are increased. It was a *result* Congress was seeking to equalize regardless of whatev-

er name or in whatever manner or form or for whatever purpose it was done. *Nicholas & Co. v. United States*, 7 Ct. Cust.App. 97, 106 (1916), *aff'd*, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919).

While Congress has amended numerous other parts of the statute during the following years, it has left these two phrases in place and intact. More recently, Judge Watson of this Court wrote, "It is a countervailing duty law that we are interpreting and, in its very nature, it must focus on the effect of subsidies on particular beneficiaries." *Michelin Tire Corp. v. United States*, 6 CIT 320, 326, 1983 WL 2215 (1983). Given this nature of the statute and the retention of the phrase "directly or indirectly", the Court must beware of permitting statutorily proscribed bounties that are avowedly of a countervailable nature to escape countervailing duties merely because of intra-corporate machinations. Such a circumvention of the long-standing and continuing will of Congress would occur here if A.S.M. were allowed to export to the United States through its wholly-owned subsidiary Angkasa goods that were subsidized by the Malaysian Government, and then completely to avoid countervailing duties on these subsidies merely by switching the exporting operations from Angkasa back to itself just when the countervailing duty investigation began. Such a result would constitute the cavalier exalting of corporate form over the express language and purposes of the countervailing duty statute.

Accordingly, the Court finds that the Department erred in failing to impose countervailing duties on A.S.M.'s exports of carbon steel wire rod to the United States corresponding to the amounts by which these exports were subsidized through Section 29 benefits. As the owner of 100 percent of Angkasa's stock, A.S.M. clearly benefits from Angkasa's revenues derived from the export of products to the United States. Whatever might or should be the policy of the Department regarding attribution between related companies generally, it is clear that in this case A.S.M. was intimately involved in Angkasa's business decisions and operations, that the companies alternated in exporting the product at issue to the United States, and that these exports benefitted from government subsidies under the Section 29 program. The facts that A.S.M. received these benefits "indirectly" through Angkasa (as opposed to the "direct" transfers in *Brass Sheet*) and that the parent and subsidiary file separate income tax returns does not negate this conclusion.

Nor is this conclusion negated by the fact that Malaysian law prohibits the "transfer" of income tax benefits between companies; that argument is legalistic sophistry. The proscription of such transfers, like similar ones in the tax laws of the United States and many other countries, must be taken to encompass such practices as, for example, the overt transfer from one company to another of the right of the first company to make deductions from or take credits against its taxable income; the second company, in other words, would take these deductions or credits against its own taxable income on its own tax returns. The defendant has presented no evidence to show that the meaning of this prohibition under Malaysian law is different from its usual meaning under the revenue laws of the United States and other countries. To hold that such practices are the only ways in which companies can benefit "indirectly" from export subsidies received by their related (especially by their wholly-owned) companies, and that the existence of laws prohibiting such practices proves that the related companies are not so benefitting, would be to unjustifiably contort our countervailing duty law well beyond the express language of the statute.

The defendant argues that Congress has not expressly defined the term "indirectly" or stated when a bounty or grant should be deemed to be bestowed "indirectly". But Congress *did use* the term "indirectly", rather than targeting solely bounties or grants bestowed "directly" or even just "bounties or grants"; and it retained the word "indirectly" over the almost one-hundred years of the existence of the statute. The defendant argues further that "when Congress has not directly addressed the

precise issue involved, the courts must give deference to the agency's interpretation of the statute which it is charged with administering if that interpretation is a permissible one...." While Congress might not, at the time it enacted the countervailing duty statute nor even subsequently, have envisioned or "directly addressed the precise issue involved" here, it is difficult to imagine a benefit more appropriately countervailed as "indirectly" bestowed than the Section 29 benefits received directly by Angkasa and indirectly by A.S.M. While an administering agency is due deference when it interprets true ambiguities in a statute that it administers, this fact does not permit such an agency in its interpretation to flout either the clear language or the legislative purposes underlying the statute. Such would be the result here: to allow the concededly countervailable-type Section 29 benefits bestowed indirectly upon A.S.M. to escape duties because A.S.M. did not receive them directly would frustrate the intent of Congress, evident in the statutory language, that duties be imposed upon goods entering the United States buttressed by *"any"* bounty or grant otherwise of a countervailable type, whether the grant be received by the exporter directly or indirectly.

In holding that these Section 29 benefits should have been countervailed, the Court expounds a narrow decision. The defendants argue that if the benefits received by Angkasa are attributed to A.S.M., then "every subsidy granted to a party with regard to a product not investigated would somehow benefit a related party with regard to a product not under investigation." Defendant's Brief at 23. The latter part of this assertion does not flow necessarily from the first part. The instant case does not involve and the Court does not here rule upon any products other than the product, carbon steel wire rod from Malaysia, subject to the Department's investigation at issue here. Therefore, the Court's ruling can not be regarded as supporting in all cases a result identical to the result reached here.

The defendants state that the plaintiffs' argument is "based upon the theory that a subsidy, by its mere bestowal, necessarily affects every corner of the corporate relationship." *Id.* This is not the basis for the Court's decision. Rather, the Court holds that when a subsidiary company exporting a specific product to the United States is granted and claims a subsidy on these exports, which subsidy is determined to be of a countervailable nature, the continuing exports to the United States by the parent company of the exact product found to be subsidized should not escape countervailing duties merely because there is no evidence that the subsidiary itself overtly transfers to the parent any specific subsidy benefits received, because the two companies file separate income tax returns (as do most related companies), or because the laws of the foreign country which granted the subsidies purport to forbid the formal transfer of tax benefits between related companies.

The scope of this holding is no broader than is necessary upon the facts of this case to effect the expressed desire of Congress to countervail wrongful subsidies received directly or indirectly. It would be an overstatement to characterize this decision as holding that "a subsidy, by its mere bestowal, necessarily affects every corner of the corporate relationship."

The defendants assert that the decision of the Court "would apply just as easily to a subsidy conferred by the Malaysian Government upon an A.S.M. subsidiary that manufactures or imports products other than wire rod." *Id.* This ignores the fact that in the instant case, the parent A.S.M. by its own actions shifted to itself the exporting of the identical product for which Angkasa had previously been granted export subsidies. It does not seem at all certain, therefore, that an attribution on these facts would require an attribution to A.S.M. of subsidies received by other subsidiaries on exports of other products that A.S.M. was not itself exporting. And it is certainly not accurate to argue that this decision requires an attribution in all cases among related companies to "every corner of the corporate relationship."

The defendants also argue that the attribution of benefits "would also apply to a

subsidy conferred upon an A.S.M. subsidiary located in a country other than Malaysia by the government of that country"; that the argument for attribution here "fails to explain how a subsidy, which passes through automatically because of a corporate relationship, can settle upon the product under investigation without diffusing among all products manufactured or sold by A.S.M. or its other subsidiaries, or among all of A.S.M.'s shareholders." *Id.* Again, this case does not involve such a complete diffusion; moreover, the Section 29 benefits received by Angkasa are not attributed to A.S.M. "automatically", solely because of the corporate relationship between the two companies. They are so attributed because A.S.M. channeled its exports of steel wire rod to the United States through its subsidiary Angkasa at a time when Angkasa was granted unfair subsidies on these exports, but then promptly transferred away from Angkasa and to itself the duty of exporting this exact product precisely at the time when Angkasa began to realize the benefits granted to it earlier on exports of this product. This does indeed explain how the Section 29 benefits at issue in this case can "settle upon the product under investigation" here "without diffusing among all products manufactured or sold by A.S.M. or its other subsidiaries."

The present decision *is* based in part upon the status of A.S.M. and Angkasa as parent and wholly-owned subsidiary, and it is true that this same status would exist even if Angkasa were located in and received subsidies from a country other than Malaysia. The present decision is not, however, grounded solely in this consideration of the status of the two companies; rather, it is the confluence of this fact and a remedial consideration in this particular case that moves the Court to its decision. The remedial concern stems from the danger perceived by the Court that in a situation like this a company can reap the full benefits of the countervailable subsidization of its exports to the United States, yet avoid all countervailing duties on those exports by the expedient inter-corporate maneuvering between itself and its wholly-owned subsidiaries. This second factor, then, might not be implicated in the situations hypothesized by the defendants if the parent did not transfer between itself and its subsidiary the task of exporting a single, specific subsidized product at the very time when a countervailing duty investigation was being undertaken concerning that product, with the effect of completely avoiding duties on the products to offset the subsidies then being realized.

The Department displayed a recognition of the "very troubling prospect of a subsidiary and its parent evading duties by alternating the years in which they apply for tax benefits or in which they export to the United States", but in this case it saw "no evidence of such a pattern developing between A.S.M. and Angkasa." 53 Fed.Reg. at 13,308. The unequivocal language of the countervailing duty statute does not indicate an intention of Congress to refrain from countervailing wrongfully subsidized imports until a "pattern" of subsidies or their shifting appears. One such transparent device is sufficient. The Section 29 benefits directly granted to and realized by Angkasa were countervailable in nature; A.S.M., as Angkasa's 100 percent owner, benefitted indirectly from these subsidies; if corresponding duties are not imposed upon A.S.M.'s exports of the same product, all of the wrongful Section 29 benefits previously granted and realized will escape uncountervailed. Therefore, the Department impermissably failed to apply the countervailing duty statute when it determined that A.S.M. did not benefit from the Section 29 benefits received earlier by Angkasa. In so doing it promulgated a final determination that was not supported by substantial evidence (the evidence is clear that the Section 29 benefits were in fact countervailable in nature) and was otherwise not in accordance with law.

### *Depreciation Allowances*

■ The plaintiffs contend that the Department's negative determination with regard to Malaysian depreciation allowances is not supported by substantial evidence on the administrative record as it must be

under the applicable standard of review. In particular, the plaintiffs challenge the Department's acceptance of the rates of depreciation set by the Malaysian Government for steel mills, which rates if fully utilized would result in the complete depreciation of a facility in six years, when, the plaintiffs assert, the Department has previously established a fifteen-year standard useful life for steel mills. The plaintiffs argue that the Department did not sufficiently verify the accuracy of the depreciation rates established by the Malaysian Government, and that there is consequently not sufficient evidence in the record to substantiate as accurate the six-year useful life for steel mills effectively applicable to A.S.M., nor to explain or justify a deviation by the Department from its alleged fifteen-year depreciation standard.

The defendant counters each of these allegations, arguing that it did conduct adequate verification, that it does not utilize a fifteen-year standard useful life for depreciation of the type of facilities involved here, and that there is adequate evidence in the administrative record to support the Department's determination that A.S.M. did not receive countervailable benefits from the Malaysian depreciation allowances.

It is necessary first to determine the type and extent of the inquiry and verification required to be conducted by the Department in this case. The plaintiffs contend that the Department "has an obligation to verify all of the information submitted by Respondents." They further contend that in the Department's investigation at issue "neither the verification report, nor the verification documents, provide a basis in the record for the Department's acceptance of the claim that the depreciation allowances reflect useful life." Plaintiffs' Brief at 15.

Section 1677e(a) of title 19 of the United States Code provides in pertinent part as follows: "The administering authority shall verify all information relied upon in making —(1) a final determination in an investigation. . . . In publishing notice of any [such investigation], the administering authority

shall report the methods and procedures used to verify such information." The two duties imposed on the Department by this statute are 1) to verify all information that it relies on in the investigation upon which its final determination is based, and 2) to report the methods and procedures that it utilized in conducting this verification. The language of the statute states a scope of required verification that is narrower than that contended for by the plaintiffs. The Department is not necessarily required by this language to verify all information submitted by the respondents in an investigation; rather, it must verify those parts of the information obtained in its investigation that it *relies upon* in making its final determination. This may or may not include all of the information submitted by the respondents in the investigation.

With regard to the depreciation allowances, the plaintiffs argue that in failing to determine independently whether the rates of these allowances corresponded to the actual useful lives of the depreciated assets, the Department failed to perform the verification required by the statute. Essentially, the Department responds that it was not required to verify the existence of such a correspondence. Instead, the Department argues that it did verify information showing that the depreciation allowances taken by A.S.M. were permitted under Malaysian law and were not limited to a specific industry or group of industries. The Department states that any Malaysian company can claim the fixed initial twenty-percent depreciation allowances, and that the annual allowances taken by A.S.M. are also generally available to Malaysian companies, depending upon the useful life of the machinery or equipment depreciated. In other words, with regard to the annual allowances, the Department's position is that because these allowances are available under Malaysian law to all Malaysian companies that depreciate the particular type of asset, and are not limited in availability to certain industries or groups of industries, the allowances do not constitute unlawful subsidies when utilized by companies that export to the United States. Having reached its negative determination on

this basis, the Department argues, it was required to verify only the information that showed this general availability. It was this information that the Department "relied upon" in making its determination, not information showing whether or not these allowances in fact accurately reflected the useful life of the equipment and the machinery depreciated. The Department contends therefore that it was not required to gather and verify information concerning the latter issue.

If the Department did not, in reaching its determination, rely upon the existence of a correlation between the depreciation rates and the useful lives of the assets, then it was not required under section 1677e(a) to verify the existence of such a correlation. Verification of information relied upon is not, however, the only requirement established by the countervailing duty legislation governing final determinations. There is also a requirement that whatever final determination the Department makes be supported by substantial evidence on the administrative record and be otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). These two requirements must be viewed as interrelated: in arriving at a final determination, the Department must rely upon information sufficient to constitute substantial supporting evidence, and it must verify this information so relied upon. The threshold question, then, is whether the Department's final determination is supported by substantial evidence.

In the present case, the question with regard to the depreciation allowances is whether the Department's negative determination concerning these allowances is supported by substantial evidence and is otherwise in accordance with law notwithstanding the fact that the Department declined to investigate whether the allowances in fact reflected the actual useful lives of the assets depreciated.

As noted above, the Department asserts that the general availability of the particular depreciation rates shows that they were not granted specifically to export industries, and that this fact constitutes substan-tial evidence that the allowances should not be regarded as unfair grants or subsidies. The Department states its "specificity test" as follows:

[I]n order to be countervailable a government activity must be targeted to a specific enterprise or industry, or group thereof, either overtly, in its title or description, or in fact, because the benefits are available and applicable to a limited number and type of companies or industries.

Defendant's Brief at 30.

Under the test methodology, the Department first examines whether a particular government program "appears to be nonspecific on its face." If this *"de jure"* test is met, the Department then conducts the *"de facto"* inquiry to determine "whether there is a disproportionate level of use by the industry under investigation or evidence of government discretion in the award of the particular benefit." *Id.*

The general availability/specificity dichotomy was at issue before the Court of International Trade in *Cabot Corp. v. United States*, 12 CIT ——, 694 F.Supp. 949 (1988). In that case, the Court stated the issue as, "whether benefits that are available on a nonpreferential basis—that is, benefits obtainable by an enterprise or industry—can be bounties or grants within the meaning of section 1303 and therefore countervailable." 694 F.Supp. at 955. While the type of allegedly countervailable benefit at issue in that case was not the same as the depreciation allowances in the present case, there is a similarity in the bases asserted by the government in support of its determinations in the two cases.

The Court in *Cabot* described the government's position in that case as follows:

The generally available benefits rule as articulated by the defendant is essentially that benefits available to all companies and industries within an economy are not countervailable subsidies. Defendant's conclusions are primarily drawn from 19 U.S.C. § 1677(5)(B), which refers to countervailable domestic subsidies as being provided to "a *specific* enterprise or industry, or group of enter-

prises or industries...." (emphasis added). Thus, argues defendant, benefits "generally available" to all enterprises or industries are not subsidies under section 1677(5)(B), and therefore do not fall within the meaning of "bounty or grant" as used in section 1303.

*Id.* at 956.

The Court felt that this position in essence reflects the view that the countervailability of benefits conferred upon a specific class logically implies, in the inverse, the *non* countervailability of generally available benefits. *See id.* In rejecting this view, and the "generally available benefits rule" based upon it, the Court identified a distinction "which disrupts the apparent symmetry" of the two underlying premises:

> The distinction that has evaded the ITA is that not all so-called generally available benefits are alike—some are benefits accruing generally to all citizens, while others are benefits that when actually conferred accrue to specific individuals or classes. Thus, while it is true that a generalized benefit provided by government, such as national defense, education or infrastructure, is not a countervailable bounty or grant, a generally available benefit—one that may be obtained by any and all enterprises or industries—may nevertheless accrue to specific recipients. General benefits are not conferred upon any specific individuals or classes, while generally *available* benefits, when actually bestowed, may constitute specific grants conferred upon specific identifiable entities, which would be subject to countervailing duties.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Thus, although a bounty or grant is preferential in nature, bestowed upon an individual class, the generally available benefits rule as developed and applied by the ITA is not an acceptable legal standard for determining the countervailability of benefits under section 1303.

*Id.*

In rejecting the generally available benefits analysis and remanding the case to the agency, the Court prescribed an approach that focuses on the "case by case effect of

benefits provided to recipients rather than on the nominal availability of benefits ..."; "on whether a benefit or 'competitive advantage' has been actually *conferred* upon a 'specific enterprise or industry, or group of enterprises or industries'." *Id.* at 957 (emphasis added).

The "specificity test" upon which the government bases its determination in the instant case appears to be substantially identical to the "generally available benefits" test rejected by the Court in *Cabot;* apparently only the name is changed.

In rejecting the government's argument that the generally available benefits test was a reasonable interpretation of and/or required by the definition of "bounty or grant" in Section 1303 of the countervailing duty statute (the same argument presented by the government in support of its test in the present case), the *Cabot* Court disagreed with the focus on the purported *availability* of government benefits rather than the actual nature and use of a particular benefit:

> This definition [in section 1303] requires focusing only on whether a benefit or "competitive advantage" has been *actually conferred* [emphasis added] on a "specific enterprise or industry, or group of enterprises or industries." [The language of section 1303] In the case before this Court, the *availability* [emphasis in original] of [the government benefit at issue] does not determine whether the benefits actually received by these two carbon black producers are countervailable subsidies.

694 F.Supp. at 957. As the *Cabot* Court rejected the "generally available benefits" test, so this Court rejects the "specificity" test relied on by the government in this case.

The Court in *Cabot* stated,

> The programs appear to [confer subsidies upon] specific identifiable enterprises. That additional enterprises or industries can participate in the programs, whether theoretically or actually [i.e., *de jure* or *de facto* ], does not destroy the programs as subsidies. The programs are apparently available to all Mexican

enterprises, but in their actual implementation may result in special bestowals upon specific enterprises.

*Id.*

The same principle is squarely applicable to the facts of the instant case. The plaintiffs contend that the annual depreciation allowances, because they do not reflect the useful lives of A.S.M.'s machinery and equipment depreciated, constitute an unfair, countervailable subsidy to A.S.M. from the Malaysian Government. The Department's response is that these allowances are *available* to all Malaysian industries depreciating similar assets.

This response misses the point. First, reflective of the situation in *Cabot*, it is not clear how many (if any) of the other Malaysian industries were able or chose to in fact avail themselves of the fourteen or sixteen percent depreciation rates. It is entirely conceivable that certain benefits, while facially available to a number of companies or industries, might, because of the nature of the benefits or other factors, in fact be utilized by only a small number of companies, so that the widespread "availability" would not reflect the true nature or use of the benefit. The Department itself stated, as noted earlier, that at the time of these events A.S.M. was the only Malaysian company producing wire rod, and Angkasa was the only Malaysian company exporting that product to the United States. On a more fundamental level, even ignoring the problems of focusing upon availability, if a particular benefit did constitute an unfair, countervailable subsidy when granted to a certain company or companies, the fact that other companies were also eligible for the benefit, or even that other companies also utilized the benefit, would not, as the *Cabot* Court pointed out, change the fact that the benefit was unfair, and thus countervailable, when granted to the first company.

The government argues that "the fourteen and sixteen percent rates are also available for depreciation of varied plants, equipment, and other items which are not connected with the steel industry." Defendant's Brief at 36. It may be that these rates are *appropriate* for depreciating the other items if they accurately reflect the items' useful lives; and if the rates do *not* reflect the useful lives of the items depreciated by A.S.M., then the fact that the rates *were* appropriate for the other items would not change the fact that they were *inappropriate* for A.S.M.'s assets, and were thus countervailable. It may be that the rates are inaccurate and inappropriate for *all* of the companies or assets for which they are "available". If so, under the above analysis, the fact that the rates were universally inaccurate should not prevent the application of countervailing duties to offset the benefits that they conferred upon A.S.M.'s exports to the United States.

The plaintiffs assert that the Department has in the past adopted a fifteen-year standard useful life for steel industry assets, and note that A.S.M.'s assets may be completely depreciated in only six years using the rates at issue here. In its Notice of Preliminary Results of Countervailing Duty Administrative Review in *Oil Country Tubular Goods From Israel*, 54 Fed. Reg. 25,145 (June 13, 1989), the Department described its methodology for allocating benefits determined to have been received by foreign producers in that case:

> [W]e allocated each grant received over 15 years, *the average useful life of assets in the steel industry*, according to the Asset Guideline Classes of the Internal Revenue Service (emphasis added).

*Id.* at 25,146.

This Court has recognized the principle that an agency must, after adopting a standard or policy, either follow the standard or policy or explain its failure to do so. In *Katunich v. Donovan*, 8 CIT 297, 599 F.Supp. 985 (1984), the Court stated,

> It is a sound principle of administrative law that an administrative agency must either follow or adhere to existing policies and precedents or explain its noncompliance or deviation.

8 CIT at 299, 599 F.Supp. at 986.

The government seeks to distinguish the previous use of this fifteen-year standard by emphasizing that the previous use was to determine the useful life of steel indus-

try assets for the purpose of *allocating over time* the value of a benefit received by a steel company from a foreign government, in contrast to the use of which the plaintiffs here contend to determine the existence of a countervailable benefit from a foreign government's tax laws. These two contexts are indeed somewhat distinguishable, but the Court does not discern much difference in the distinction. The present case does involve the determination of the existence of countervailable benefits from a foreign government's tax programs, while the previous context involved other types of foreign government grants or benefits. Nevertheless, the sources and recipients of the benefits are the same in both contexts: foreign governments and companies, respectively. Moreover, if the fifteen-year useful life for steel industry assets is accurate for purposes of allocating benefits over time, so as to meet the substantial evidence standard in that context, the Court sees no reason why a different useful life should be used for the same assets from the same industry in this case. Having adopted the fifteen-year standard, the Department is obliged to either follow it subsequently or explain its reasons for failing to do so. It has done neither in this case.

With respect to the depreciation allowances at issue here the Court cannot discern or evaluate the accuracy of the depreciation allowances taken by A.S.M., because the Department has chosen in its investigation to avert its gaze from this issue. For this reason, the Department's negative determination regarding the allowances is not supported by substantial evidence on the record.

The Department argues that it is not required to "look behind" the actions of a foreign government—here, the actions of the Malaysian Government in setting the annual depreciation rates at issue—and cites as support for its position the decision of this court in *Al Tech Specialty Corp. v. United States*, 11 CIT 372, 661 F.Supp. 1206 (1987). In *Al Tech*, the Court found, *inter alia*, that there was substantial evidence on the record to support the International Trade Administration's determination that preferential loan repayment terms granted to a Spanish company pursuant to reorganization proceedings in a Spanish bankruptcy court did not constitute countervailable benefits. The *Al Tech* Court opined:

> Moreover, it is not required, and may be inappropriate, for the ITA to "look behind" the actions of the Spanish tribunal in the absence of facts tending to establish the existence of a "discrete class of beneficiaries," ... to whom the benefits accrue. There is nothing to suggest that the bankruptcy provisions, designed to assist financially troubled debtors, operate in practice to benefit specific enterprises or industries.

11 CIT at 380, 661 F.Supp. at 1213.

The facts presented in *Al Tech* differ from those of the present case in several important respects. First, the Court in *Al Tech* expressed its hesitancy to second-guess the judgment of a foreign judicial tribunal in a particular case that was properly before the jurisdiction of that tribunal. Such prudence is indeed warranted in that situation, where the foreign tribunal is closer to the unique facts and applicable law in a particular controversy. This consideration is not present in the instant case. Related to this distinction, the subject of the foreign proceedings at issue in *Al Tech* —the particular type of reorganization to be shaped for a bankrupt company—differs substantially from the subject of the present dispute—the useful lives of certain types of assets. This latter subject is more susceptible to empirical analysis and quantitative determination, and it is therefore a more appropriate subject of inquiry for the Department than is the former area.

With regard to the propriety generally of "looking behind" the acts of foreign governments, the very essence of an affirmative countervailing duty determination is a determination by the Department, after having examined particular policies or programs of, or grants by, *a foreign government*, that these policies, programs, or grants are in the Department's opinion unfair or unjustifiable. It is the decisions and acts of foreign governments that are

by definition the subject of countervailing duties investigations. Moreover, the question arises, pursuing the Department's refusal to examine the depreciation rates, whether the Department would persist in its refusal if the Malaysian Government set the useful life of steel industry machinery at three years; or one year; or six months.

The Department in fact seems to have realized these logical limits of a refusal to examine depreciation rates. In its Brief, the Department states its policy qualifiedly as one of refusing to examine the accuracy of foreign depreciation rates "unless evidence on the record demonstrates that the useful life of a specific product appears relatively excessive", Defendant's Brief at 33, or "absent evidence that the depreciation rates benefitted specific enterprises or industries." *Id.* at 35. In those situations, presumably it would *not* be objectionable to "look behind" the action of the foreign government. The Department contends that in the present case "[t]here was no evidence which would demonstrate that the annual allowances did not reflect the useful life of the assets", *id.* at 32, citing the availability of the rates for other industries as well. Given the Department's past adoption of the fifteen-year useful life for steel industry assets, the more relevant question here seems to be whether there were any evidence which would demonstrate that the annual allowances at issue *did* reflect the useful life of the assets. Because the Department did not inquire into this question and arrive at a substantive answer thereto, there is no basis upon which this Court can examine the merits of the Department's conclusions; therefore, the Department's negative determination concerning these conclusions (*i.e.*, the reasonableness or appropriateness of a six-year versus a fifteen-year depreciation schedule for steel production facilities assets) can not be found to be supported by substantial evidence.

## CONCLUSION

It is the duty of this Court in reviewing final antidumping and countervailing duty determinations, while generally deferring to the agency's methods and findings, to ensure that the relevant statutes and underlying Congressional purposes are given full effect by the agency. It is difficult to imagine a more clear example of an indirect subsidy than the one received by A.S.M. by virtue of the (Malaysian) Section 29 benefits granted to Angkasa. In failing to order the levy of countervailing duties on A.S.M.'s exports to the United States to counteract these subsidies, the Department contravened its legislative mandate.

With regard to the depreciation rates, the Department failed satisfactorily to investigate the important issue of whether or not these rates accurately reflected the useful lives of the depreciated assets. Because of this failure, the Court is unable to perform its task of ensuring that the Department's resolution of this issue is supported by substantial evidence on the administrative record.

Because of these infirmities, the Court remands this case to the Department for a revision of the final determination regarding the Section 29 benefits, and for an investigation of whether the depreciation allowances claimed by A.S.M. for its machinery and equipment at issue in this action accurately reflected the useful life of these assets.

## ORDER

Upon consideration of the motions and pleadings of the parties in this action,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Judgment on the Agency Record is granted; and it is further

ORDERED that this action is remanded to the Department of Commerce for a revision of its final determination in this matter concerning the Section 29 Benefits and for further investigation of the Malaysian depreciation allowances, as discussed in the Court's opinion, in a manner consistent with this opinion; and it is further

ORDERED that the Commerce Department report to this Court the results of the Department's proceedings on remand within 60 days of the date of this order.