**PPG INDUSTRIES, INC.,**
**Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee,**

**Vitro Flotado, S.A. and Vidrio Plano de Mexico, S.A., Defendants.**

No. 88–1175.

United States Court of Appeals,
Federal Circuit.

March 22, 1991.

Rehearing Denied April 17, 1991.

Suggestion for Rehearing In Banc
Declined May 20, 1991.

Terence P. Stewart, Stewart & Stewart, Washington, D.C., argued for plaintiff-appellant. With him on the brief were Eugene L. Stewart, David Scott Nance and William A. Fennell.

A. David Lafer, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellee. With him on the brief were John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director and Velta A. Melnbrencis, Asst. Director. Also on the brief were Robert H. Brumley, Gen. Counsel, M. Jean Anderson, Chief Counsel for International Trade and Lisa B. Koteen, Acting Sr. Counsel for Policy, Office of the Gen. Counsel for Internation-

al Trade, U.S. Dept. of Commerce, of counsel.

David A. Amerine, Brownstein Zeidman & Schomer, Washington, D.C., argued for defendants. With him on the brief was Irwin P. Altschuler.

Before NIES, Chief Judge,* SMITH, Senior Circuit Judge,** and MICHEL, Circuit Judge.

NIES, Chief Judge.

This appeal is from the decision of the United States Court of International Trade in *PPG Indus., Inc. v. United States*, 11 CIT 344, 662 F.Supp. 258 (1987), upholding the determination of the International Trade Administration (ITA or agency) that unprocessed float glass from Mexico was not subject to countervailing duties under 19 U.S.C. § 1303(a) (1982) by reason of certain programs instituted by the government of Mexico, namely, the Trust Fund for the Coverage of Exchange Risks (FICORCA) and the sale of natural gas at controlled prices. The trial court concluded that the administrative record did not establish that the benefit from these programs constituted a "bounty or grant" within the meaning of section 1303(a) as a matter of law or fact. We affirm.

I

■ The issue in this appeal broadly concerns what type of domestic subsidy received by a foreign producer from its government gives rise to a countervailing duty under 19 U.S.C. § 1303 upon importation of its goods into the United States.[1] The goods in question, "float glass," a type of flat glass, were imported from Mexico during the period January 1 to September 30, 1983. *See Unprocessed Float Glass From Mexico*, 48 Fed.Reg. 56095 (Dec. 19, 1983) (Preliminary Affirmative Countervailing Duty Determination). In pertinent part, Section 1303 provides:

> [W]henever any country ... shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise produced in such country, then upon the importation of such article or merchandise into the United States, there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant....

Under this part of the statute the question would be phrased in terms of what is a "bounty or grant." However, because of the interrelationship of section 1303 and 19 U.S.C. § 1677,[2] the following provision of section 1677(5) is also pertinent:

> The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 1303 of this title, and includes, but is not limited to, the following:

> (A) Any export subsidy described in Annex A to the Agreement (relating to illustrative list of export subsidies).

> (B) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

---

* Chief Judge Nies assumed the position of Chief Judge on June 27, 1990.

** This case was heard prior to the time Senior Circuit Judge Smith took Senior status on June 1, 1989.

1. Mexico, at the time of this investigation, was not a "country under the Agreement [GATT subsidies code]". Thus, Section 303 of the Tariff Act of 1930 (19 U.S.C. § 1303) applies in this case rather than the countervailing duty provisions implemented in the Trade Agreements Act of 1979 (19 U.S.C. §§ 1671–1677g).

2. This section was added by the Trade Agreements Act of 1979, Pub.L. No. 96–39, Title I, § 101, 93 Stat. 144, 176 in response to the U.S.'s adherence to the newly created "subsidies code" of the General Agreement on Tariffs and Trade (GATT). *See PPG Indus.*, 662 F.Supp. at 262–263. For a full explanation of the relationship between Section 1303 and the provisions added to conform U.S. law with the GATT Subsidies Code, *see Bethlehem Steel Corp. v. United States*, 7 CIT 339, 590 F.Supp. 1237, 1239–41 (1984).

(i) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.

(ii) The provision of goods or services at preferential rates.

(iii) The grant of fund or forgiveness of debt to cover operating losses sustained by a specific industry.

(iv) The assumption of any costs or expenses of manufacture, production, or distribution.

19 U.S.C. § 1677(5) (1982).[3] From this provision it becomes clear that the countervailing duty statute contemplates two types of subsidies which give rise to additional duties: (1) export subsidies, that is, a benefit conferred only on goods that are exported, all of which are countervailable unless *de minimis*, and (2) domestic subsidies which may or may not be countervailable. With respect to the latter type of subsidy, the ITA has interpreted the statute to require that a domestic subsidy must be provided to a "specific enterprise or industry, or group of enterprises or industries" to be countervailable. *See Certain Steel Products From Belgium*, 47 Fed.Reg. 39304, 39328 (1982) (Appendix 4). Under this standard, the FICORCA program and Natural Gas pricing policies established by the Mexican government did not constitute, per ITA, a countervailable "bounty or grant" within the purview of Section 1303 because they were not directed by their terms to the float glass industry or a group of specific industries nor, in actual implementation, did the programs in fact bestow a benefit on a *specific* industry or group.

## II

### Standard of Review

The Supreme Court has instructed that the courts must defer to an agency's interpretation of the statute an agency has been charged with administering provided its interpretation is a reasonable one. As the Supreme Court has succinctly stated:

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *accord K Mart v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Georgetown Steel Corp. v. United States*, 801 F.2d 1308, 1318 (Fed.Cir.1986); *Kester v. Horner*, 778 F.2d 1565, 1569 (Fed. Cir.1985) ("To sustain an agency's construction of its authority, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings."), *cert. denied*, 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986); *Corning Glass Works v. United States Int'l Trade Comm'n*, 799 F.2d 1559, 1565 (Fed.Cir.1986). Moreover, the Secretary of Commerce through the ITA has been given great discretion in administering the countervailing duty laws. As we noted in *Smith Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir.1983) in discussing the Secretary's comparable authority under the antidumping law:

The Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, establishes an intricate framework for the imposition of antidumping duties in appropriate circumstances. The number of factors involved, complicated by the difficulty in quantification of these factors and the foreign policy repercussions of a dumping determination, makes the enforcement of the antidumping law a difficult and supremely delicate endeavor. The Secretary of Commerce ... has been entrusted with responsibility for imple-

---

**3.** This section was amended in 1988 by Pub.L. No. 100–418, Title I, Subtitle C, part 2 § 1312, 102 Stat. 1184. This amendment added a "Special Rule" that precluded a determination that a benefit was not countervailable solely because it was "nominally generally available." In essence, it codified that portion of the decision in *Cabot v. United States*, 9 CIT 489, 620 F.Supp. 722 (1985), which rejected *nominal* general availability as a test for countervailability.

menting the antidumping law. The Secretary has broad discretion in executing the law.

These considerations are equally applicable to administration of the countervailing duty statute.[4] As this court's predecessor has repeatedly opined, countervailing duty determinations involve complex economic and foreign policy decisions of a delicate nature, for which the courts are woefully ill-equipped. *United States v. Hammond Lead Prods., Inc.*, 440 F.2d 1024, 1030, 58 CCPA 129, *cert. denied*, 404 U.S. 1005, 92 S.Ct. 565, 30 L.Ed.2d 558 (1971); *United States v. Zenith Radio Corp.*, 562 F.2d 1209, 1216, 64 CCPA 130 (1977), *aff'd*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978).

The Supreme Court's direction in *Chevron*, 467 U.S. at 844–45, 104 S.Ct. at 2782–83, could not be clearer:

> We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations
>
> > "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations. *See, e.g., National Broadcasting Co. v. United States*, 319 U.S. 190 [63 S.Ct. 997, 87 L.Ed. 1344 (1943)]; *Labor Board v. Hearst Publications, Inc.*, 322 U.S. 111 [64 S.Ct. 851, 88 L.Ed. 1170 (1944)]; *Republic Aviation Corp. v. Labor Board*, 324 U.S. 793 [65 S.Ct. 982, 89 L.Ed. 1372 (1945)]; *Securities & Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194 [67 S.Ct. 1575, 91 L.Ed. 1995 (1947)]; *Labor Board v. Seven–Up Bottling Co.*, 344

U.S. 344 [73 S.Ct. 287, 97 L.Ed. 377 (1953)].

> "... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *United States v. Shimer*, 367 U.S. 374, 382, 383 [81 S.Ct. 1554, 1560, 6 L.Ed.2d 908] (1961).

*Accord, Capital Cities Cable, Inc.* [*v. Crisp*], *ante* [467 U.S. 691], at 699–700 [104 S.Ct. 2694, 2700–2701, 81 L.Ed.2d 580 (1984)].

This particular discretion applies equally to resolving what constitutes a "bounty or grant." As a predecessor of this court has stated:

> Congress' intent to provide a wide latitude within which the [Secretary] may determine the existence or nonexistence of a bounty or grant, is clear from the statute itself, and from the congressional refusal to define the words 'bounty,' [or] 'grant' ... in the statute or anywhere else, for almost 80 years.

*United States v. Zenith Radio Corp.*, 562 F.2d at 1216. And, in reporting the Trade Agreements Act of 1979, Congress acknowledged that, under the provision here at issue, "[t]he Secretary of the Treasury has discretion in determining what is a bounty or grant." Report of the Committee on Finance of the United States Senate on H.R. 4537, S.Rep. No. 96–249, 96th Cong., 1st Sess. 84 (1979) [, U.S.Code Cong. & Admin.News 1979, pp. 381, 470.] *See also* Berger, *Judicial Review of Countervailing Duty Determinations*, 19 Harv. Int'l L.J. 593, 604–606 (1978); O'Neill, *United States Countervailing Duty Law: Renewed, Revamped and Revisited— Trade Act of 1974*, 17 B.C. Indus. & Comm. L.Rev. 832, 864 (1976); Butler, *Countervailing Duties and Export Subsidization:*

---

**4.** *See* J. Bello and A. Holmer, *Subsidies and Natural Resources: Congress Rejects a Lateral Attack on the Specificity Test* (hereinafter *"Subsidies"*), 18 Geo.Wash.J. of Int'l Law & Economics 297, 305–08 (1984) (Discussion of some of the congressional concerns for including "specificity" language).

*A Reemerging Issue in International Trade,* 9 Va.J.Int'l L. 82, 125 (1969).

■ Given these circumstances, appellant's burden on appeal is a difficult one, for it must convince us that the interpretation of "bounty or grant" adopted by the ITA is effectively precluded by the statute. PPG's efforts have been unsuccessful.

### III

### Requirement of Specificity

PPG first mounts a broadside attack on ITA's interpretation that a domestic subsidy must benefit a specific industry or group for such subsidy to constitute a "bounty or grant" within the meaning of § 1303. Per PPG, the legal test for determining whether a benefit is a "bounty or grant" for countervailing duty purposes is whether "that benefit allows goods to be sold for less in the United States than would otherwise be possible." PPG contends that the ITA's specificity test goes against (1) the language of the statute, (2) longstanding judicial definitions of "bounty or grant", and (3) the Congressional purpose behind the countervailing duty statutes.

### A.

■ PPG urges that the broad language used in Sections 1303 and 1677(5) requires the term "bounty or grant" to be interpreted, as a matter of law, as broadly as possible. In section 1303, PPG points to the word "any" preceding "bounty or grant", the reference to "direct or indirect" bounties or grants, the phrase "paid or bestowed", and the inclusion of benefits whether "on production, manufacture or export." In section 1677(5), the salient language, per PPG, is "but is not limited to," which precedes the enumerated examples of benefits which may constitute a "subsidy."

This language itself, individually or collectively, does not compel a definition of "bounty or grant" as all encompassing of domestic subsidies as PPG seeks. As interpreted by the ITA, the broad term "domestic subsidy" is limited by the language of section 1677(5)(B) in that such subsidy is countervailable only if provided by the foreign government to a "specific enterprise or industry, or group of enterprises or industries." In the ITA's view, this limitation in the statute would be made superfluous by an interpretation that every domestic subsidy on imported goods which confers a competitive advantage vis-a-vis U.S. competitors is a countervailable "bounty or grant."

In this connection, in *ASG Indus., Inc. v. United States,* 610 F.2d 770, 67 CCPA 11 (1979), our predecessor court dealt with certain benefits under West German regional development programs, which the ITA rejected as countervailable even though directed to a "specific" group of industries because the benefits did not have the requisite effect on international trade. While holding such benefits to be countervailable if more than *de minimis,* the court in *ASG* emphatically rejected ASG's test that "any benefit (that is not *de minimis*) bestowed by a foreign government in connection with the production of merchandise requires a countervailing duty." *ASG,* 610 F.2d at 777. The *ASG* court held that this test, which is the same as PPG's proposed test, "*ignores* the clear wording of the *statute....* [A]ll relevant circumstances are to be taken into account." *Id.* (Emphasis added.) When the statute is read as a whole, a "specificity" requirement is neither precluded nor unreasonable as a matter of statutory construction.

### B.

PPG next argues that its broad interpretation of "bounty or grant" is required in order to be in line with longstanding judicial precedent. According to PPG, the courts (including the Supreme Court) "have consistently defined 'bounty or grant' and 'subsidy' in terms of the effect of foreign government programs on the ability of foreign producers to sell their products for less in the U.S." For this proposition, appellant quotes statements from *Downs v. United States,* 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903); *G.S. Nicholas & Co. v.*

*United States,* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919); *United States v. Zenith Radio Corp.,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978); the aforementioned *ASG Indus., Inc. v. United States,* 610 F.2d 770, 67 CCPA 11 (1979); *Georgetown Steel Corp. v. United States,* 801 F.2d 1308 (Fed.Cir.1986) and from various lower court opinions in those cases.

These authorities do not present, as PPG asserts, a bulwark of historical judicial precedent defining "bounty or grant" so as to preclude a requirement of beneficial "specificity" for *domestic* subsidies. The passages cited by PPG amount simply to isolated, broad statements taken out of context with reference to a different version of the statute in some instances and without reference to the actual benefit considered in the particular case. In *Downs,* for example, the Supreme Court held that a remission *on exportation* by the Russian government of a tax imposed on sugar through the issuance of saleable certificates was an indirect bounty. In that case, the benefit was an export bounty, not a *domestic* subsidy of the sugar industry.[5] Likewise, *Nicholas* involved the payment by the British government of allowances upon exportation of certain British spirits.

It is surprising that PPG can find support in *Zenith Radio Corp.* for its advocacy of a sweeping inclusion of all competitive benefits under the rubric of "bounty or grant." There, the Secretary of Treasury (who then administered this statute), in interpretating the very language at issue here, held that the remission of an indirect tax on electronic products upon export *was not* a "bounty or grant" within the meaning of the statute. In affirming, the Court held the interpretation by the Secretary to be reasonable, stating:

> More fundamentally, as the Senate Committee with responsibility in this area recently stated, " 'the issues involved in applying the countervailing duty law are complex, and . . . internationally, there is [a] lack of any satisfactory agreement on

what constitutes a fair, as opposed to an "unfair," subsidy.' " S.Rep. No. 93–1298, p. 183 (1974). In this situation, it is not the task of the judiciary to substitute its views as to fairness and economic effect for those of the Secretary.

*Zenith Radio Corp.,* 437 U.S. at 458–59, 98 S.Ct. at 2449. Finally, *ASG,* discussed above, and *Georgetown Steel,* 801 F.2d 1308 (Fed.Cir.1986), which held nonmarket economies to be outside the purview of countervailing duty laws, did not discuss the specificity test, much less rule it out.

In sum, the statutory term "bounty or grant" has not been *defined,* as a matter of law, by the courts to encompass *every domestic subsidy conferring a competitive advantage* and, thus, does not mandatorily prohibit the limitation of countervailable domestic subsidies in the present statute to benefits provided only to a specific industry or group of industries.

### C.

■ PPG urges that ITA's interpretation of the law is contrary to the intent of Congress that the countervailing duty law neutralize all subsidies that allow foreign goods to be sold for less in the United States. PPG discerns this single overriding congressional purpose from a consistent historical pattern of expansion of the reach of the countervailing duty laws by legislative enactments. While a review of the history of legislation regarding the countervailing duty laws does evidence the intent of Congress to broaden the reach of these laws, at the same time, Congress has effectuated such intent incrementally by the specific language chosen in each enactment, and each enactment pertained to specific situations as detailed therein. As an example, after the general "bounty or grant" language was added in 1897 to the original enactment which only affected export bounties on sugar, the law was expanded in 1909 to cover any governmental unit of a country. *See* Tariff Act of 1909, Pub.L. No. 61–5, ch. 6 § 6, 36 Stat. 11, 85

---

**5.** For a thorough and reasoned analysis of the import of the *Downs* opinion, *see United States v. Zenith Radio Corp.,* 562 F.2d 1209, 1212–16,

64 CCPA 130 (1977), *aff'd,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978).

(1909). Later, in 1921 the statute was amended to include as countervailable bounties or grants bestowed on the *manufacture* of an exported product rather than solely by reason of the act of exportation, for the first time bringing domestic subsidies into the law. *See* Tariff Act of 1922, Pub.L. No. 67–318, Title III § 303, 42 Stat. 935; *Subsidies,* 18 Geo.Wash.Int'l J. of Law & Economics at 302–3. The next change noted by PPG occurred in 1974 when Congress delineated specific procedures to be followed in the conduct of a countervailing duty investigation, in particular setting time limits and providing U.S. industries the right to obtain judicial review of duty determinations. *See* Trade Act of 1974, Pub.L. No. 93–618 § 331, 88 Stat. 1978, 2049–53. And finally, the Trade Agreements Act of 1979 was enacted to conform the U.S. countervailing duty law to the requirements of GATT. *See supra,* n. 2. In this enactment, Congress added Section 1677(5), wherein the language "specific enterprises or industries, or group of enterprises or industries" used by the ITA in determining whether a domestic subsidy is a "bounty or grant" is found. None of these enactments mandates that the terms "bounty or grant" must encompass every subsidy provided by the government to industries within that country.

As appellant has acknowledged in its briefs, Section 1677(5) was enacted to conform U.S. countervailing duty law to the GATT Subsidies Code.[6] The GATT Subsidies Code contains the specific statement:

> Signatories recognize that subsidies other than export subsidies are widely used as important instruments for the promotion of social and economic policy objectives and *do not intend to restrict the right of signatories to use such subsidies* to achieve these and other important objectives which they consider desirable.

**6.** The relevant Senate Report specifically states:
> The committee believes the procedures and standards under [the] new title [on countervailing duties for GATT signatories] are a significant improvement over existing law and practice and should be applied to section [1]303. . . .

[Subsidies Code, art. 11, para 1, emphasis in original.]

PPG's definition of "bounty or grant," as applied to domestic subsidies, would override the narrower definition of "domestic subsidy" in section 1677(5) and to a large extent would nullify the Congressional purpose of conforming our law with GATT.

The view that these complicated statutes have only one purpose, namely, to protect U.S. industry from every competitive advantage afforded by foreign governments, is simplistic and myopic. The congressional debates and the objectives listed in the GATT Subsidies Code indicate that numerous public policies, some of which conflict with overcoming a competitive advantage, entered into enactment of these statutes and must be considered by ITA.

The GATT Subsidies Code specifically states that:

> Signatories note that among such objectives are:
>
> (a) the elimination of industrial, economic and social disadvantages of specific regions,
>
> (b) to facilitate the restructuring, under socially acceptable conditions, of certain sectors, especially where this has become necessary by reason of changes in trade and economic policies, including international agreements resulting in lower barriers to trade,
>
> (c) generally to sustain employment and to encourage re-training and change in employment,
>
> (d) to encourage research and development programmes, especially in the field of high-technology industries,
>
> (e) the implementation of economic programmes and policies to promote the economic and social development of developing countries,
>
> (f) redeployment of industry in order to avoid congestion and environmental problems.

S.Rep. No. 249, 96th Cong., 1st Sess. 104, *reprinted in* 1979 U.S.Code Cong. & Admin.News 381, 490. *See Canadian Fur Trappers Corp. v. United States,* 884 F.2d 563, 567 (Fed.Cir.1989) ("Congress made the provisions of 19 U.S.C. §§ 1671–1677[g] applicable to actions fitting under the amended section 1303.").

Subsidies Code, art. 11, para. 1. The broad brush single purpose approach PPG advocates does not accord with the multi-purpose objectives set forth above.

### D.

Finally, as a reason to prohibit the ITA's specificity test, PPG argues that such a test yields the "absurd" result that the more widely a domestic subsidy is available and the more products that benefit from it, the less likely it would be that the subsidy would be countervailable. That is essentially the policy argument which has flared from time to time in Congress and it remains a policy choice for Congress in the first instance, not the courts. When some members of Congress in 1984 sought to make natural resource subsidies countervailable *per se* where an industry was a disproportionate user, the legislation failed to be enacted. Indeed, the limited scope of that proposed legislation undercuts PPG's argument that the ITA is now precluded under the statute from requiring specificity in connection with any type of domestic subsidy. Had the legislation been enacted, it would not have affected application of a specificity test in general, for example in connection with FICORCA.

### E.

In sum, the ITA's interpretation of section 1303 is reasonable that domestic subsidies must be bestowed only on a specific enterprise or industry or a specific group of enterprises or industries to be countervailable. Therefore, the ITA's interpretation must be upheld by the courts.

### IV

█ Accepting that "specificity" is a requirement for countervailability of a domestic subsidy, PPG argues that the requirement of specificity must be deemed met—as a matter of law—if the recipients of the subsidy are simply "identifiable." That is, if a company or companies which receive benefits can be named, they would be "identifiable" and "specific." While PPG asserts this argument primarily in connection with FICORCA which has fewer

participants than the natural gas pricing program, no reason is given for excluding the latter. It would appear that industrial customers of natural gas from the state monopoly could also be identified.

ITA does not follow PPG'S specificity test. The ITA's specificity test is two-fold. If the domestic subsidy is provided by its terms to a particular enterprise or industry or group of enterprises or industries, it is countervailable without further inquiry. If the benefit appears by its terms to be nominally generally available to all industries, the benefit may nevertheless be countervailable if, *in its application,* the program results in a subsidy only to a specific enterprise or industry or specific group of enterprises or industries. *See 1 Commerce Department Speaks on Import and Export Administration, 1984* at 319, 476–77 n. 26; *see, e.g., Anhydrous and Aqua Ammonia from Mexico,* 48 Fed.Reg. 28523 (June 22, 1983) (Final Negative Countervailing Duty Determination); *Certain Softwood Products from Canada,* 48 Fed.Reg. 24159 (May 31, 1983) (Final Negative Countervailing Duty Determination); *Certain Steel Products From the Netherlands,* 47 Fed. Reg. 26335, 26336 (June 17, 1982) (Preliminary Affirmative Countervailing Duty Determination). As the ITA recently summarized its position:

> Based on our six years of experience in administering the law, we have found thus far that the specificity test cannot be reduced to a precise mathematical formula. Instead, we must exercise judgment and balance various factors in analyzing the facts of a particular case in order to determine whether an "unfair" practice is taking place.

> Among the factors we consider are: (1) the extent to which a foreign government acts to limit the availability of a program; (2) the number of enterprises, industries, or groups thereof which actually use a program, which may include the examination of disproportionate or dominant users; and (3) the extent to which the government exercises discretion in making the program available. The Department must consider all of these factors in light of the evidence on

the record in determining the specificity in a given case.

*Certain Softwood Lumber Products from Canada,* 51 Fed.Reg. 37453 (1986). *See also Countervailing Duties: Notice of Proposed Rulemaking,* 54 Fed.Reg. 23366, 23379 (May 31, 1989).

This standard is in accord with the decision of the Court of International Trade involving an investigation into imports of carbon black from Mexico, authored by Judge Carman, in *Cabot Corp. v. United States,* 9 CIT 489, 620 F.Supp. 722 (1985) *dismissed as unappealable,* 788 F.2d 1539 (Fed.Cir.1986); *see also Cabot Corp. v. United States,* 694 F.Supp. 949 (Ct.Int'l Trade 1988) (Carman, J.); *PPG Indus.,* 662 F.Supp. at 264 (Carman, J.); *Alberta Pork Producers' Marketing Bd. v. United States,* 11 CIT 563, 669 F.Supp. 445 (1987); *Can–Am Corp. v. United States,* 11 CIT 424, 664 F.Supp. 1444 (1987). As explained in *Cabot,* 620 F.Supp. at 732, application of the *de facto* aspect of the specificity test requires a "case by case" analysis to determine whether "there has been a bestowal upon a specific class." Judge Carman restated the *Cabot* specificity test in this case in terms of inquiring into "whether there is a discrete class of beneficiaries" noting that in *Cabot*

> [t]he record established that no enterprise or industry in Mexico other than the carbon black industry had the technology or ability to make commercial use of the [subsidized carbon black feedstock]. Thus, although the favorable price for carbon black feedstock was nominally available to *all* Mexican enterprises and industries, it appeared that the program actually conferred a benefit upon a specific enterprise or industry, or group of enterprises or industries.

*PPG Indus.,* 662 F.Supp. at 266 and n. 5 (emphasis in original).

PPG does not contend that either FICORCA or the natural gas program confers a benefit *de facto* on the float glass industry as a discrete, selective or targeted class comparable to the class identified as possible *de facto* sole recipients of the carbon black feedstock subsidy in *Cabot.*

While PPG asserts it meets a specificity test, PPG seeks reversal not as a matter of fact but law; PPG simply wants a *different de facto* test based merely on the recipients of the subsidy being identifiable.

Nothing in the statute mandates PPG's interpretation that specificity is met merely if recipients of a domestic subsidy are *identifiable.* Moreover, given the policy choice involved in adopting PPG's interpretation, this is a matter on which a court must defer to the agency. Thus, this argument does not require reversal. The statute does not mandate that "specific" means no more than "identifiable."

## V

Falling back to an even narrower position, PPG asserts that the FICORCA and natural gas subsidy programs fit within the ITA's specificity standard. At this point, review of the details of these programs is appropriate.

### A.

■ FICORCA is a trust fund for the coverage of risks provided by the government of Mexico to industries on an eligibility basis. In its original petition to initiate an investigation, PPG argued to the ITA that the Mexican float glass producers were eligible for this program; that the program guarantees the rate at which debtor companies buy foreign exchange to pay extended debt; and that program participation in FICORCA by the eligible float glass industry made such products subject to countervailing duties.

As a result of its investigation, the ITA found:

> FICORCA is a trust fund set up by the Mexican government and the Bank of Mexico operating through the country's credit institutions. All Mexican firms with registered debt in foreign currency and payable abroad to Mexican credit institutions or to foreign financial entities or suppliers may purchase, at a controlled rate, the amount in dollars necessary to pay principal on the loan. All loans which are covered by the program must be long-term or be restructured on

a long-term basis. The program was terminated December 20, 1982. Companies had until October 25, 1983 to register for the program. We verified that the float glass companies did not have any rescheduling of debt during our period of investigation. The float glass companies have not used the program. We also have verified documentation that the program is available to all Mexican firms with foreign indebtedness; it is not targeted to a specific industry or enterprise, groups of industries or enterprises, or to companies located in specific regions. FICORCA is also not tied in any way to exports.

*Float Glass From Mexico,* 49 Fed.Reg. at 23099. On that basis, the ITA determined that the FICORCA program was not countervailable. *Id.* PPG attacks this conclusion because the program contains certain "eligibility requirements", which per PPG, limits the group and makes it "specific."

■ The trial court is correct that the existence of eligibility requirements does not suffice to identify a discreet class which has been afforded the benefits of a "bounty or grant." *See, e.g., Carlisle Tire and Rubber Co. v. United States,* 5 CIT 229, 564 F.Supp. 834, 836 n. 3 (1983) (Tax benefit not countervailable where not every company can meet eligibility criteria). Although eligibility requirements may, if sufficiently narrowly tailored, *de facto* render the benefit one targeted to a specific industry or group of industries, the Court of International Trade and the ITA both determined that these eligibility requirements did not present such a case. *See PPG Indus.,* 662 F.Supp. at 266; *Float Glass From Mexico,* 49 Fed.Reg. at 23099. PPG's arguments are unpersuasive that ITA's application of the specificity standard to FICORCA is unsupported by substantial evidence or otherwise not in accordance with law.

### B.

### Natural Gas Pricing Policy

■ The Mexican government holds a monopoly on the sale of basic fuels in Mexico. Operating through a state-owned facil-

ity, Petroleos Mexicanos (PEMEX), Mexico sells natural gas produced in Mexico at controlled prices. There are two categories of natural gas prices in Mexico, one for industrial use and a higher price for residential use. The prices set by the Mexican government for industrial users are well below the export price for Mexican natural gas and the world market price.

Before the ITA and the Court of International Trade, PPG asserted that preferential discounted natural gas rates were given to the float glass industry as compared to other industries, thus bringing the subsidy under section 1677(5)(B)(ii). Upon investigation, the ITA found that the evidence was to the contrary, stating:

We verified that the float glass companies paid the published price for natural gas which was available to all industries, and therefore received no benefit.

*Float Glass From Mexico,* 49 Fed.Reg. at 23099. The trial court affirmed. *PPG Indus.,* 662 F.Supp. at 272. This issue is not raised on appeal.

In its reply brief, PPG appears to argue for the first time that the float glass industry is part of a larger specific group, that is, "energy-intensive" industries, and that, therefore, it meets the specificity test. In this connection, it must be noted that this was not the first case to raise the issue of the countervailability of the Mexican natural gas program, in none of which was this domestic subsidy program countervailed. The basic determination with respect to the program was made in *Final Negative Countervailing Duty Determination on Anhydrous and Aqua Ammonia from Mexico. See* 48 Fed.Reg. 28523 (June 22, 1983). Despite the "energy-intensive" nature of that industry, the ITA ruled that the Mexican subsidization of natural gas was not countervailable. This conclusion was also reached in connection with *Portland Hydraulic Cement Clinker from Mexico. See* 48 Fed.Reg. 43063 (Sept. 21, 1983) (*Final Affirmative Countervailing Duty Determination*).

Indeed, ultimately the Mexican natural gas program was held by the ITA after remand to be noncountervailable in the

*Cabot* investigation where it was also at issue. This determination was affirmed by the court on June 7, 1989. *See Carbon Black From Mexico*, 55 Fed.Reg. 5643 (February 16, 1990) (Amendment to Final Determination) and 51 Fed.Reg. 13269 (April 18, 1986) (Preliminary Determination) and citations therein. Because no additional information was provided by PPG to cause ITA to review its prior determination that the program was not countervailable as a general proposition by reason of the differential in pricing between Mexican and foreign prices of natural gas, the ITA did not do so in this case and, therefore, limited its inquiry to the only other charge made by PPG, namely, that special discounts were afforded the float glass industry. *Float Glass From Mexico*, 48 Fed. Reg. at 56095 (Dec. 19, 1983) (Preliminary Affirmative Countervailing Duty Determination). Neither the ITA nor the court below discussed "energy-intensive" as a category of "specific" industries, inasmuch as it appears to be an argument raised only on appeal. Nevertheless, it also appears quite clear from ITA's prior determinations that ITA does not recognize "energy-intensive" as a category of "specific" industries. In the ammonia and cement investigations, the subsidized resources are reported to have accounted for *eighty* percent and *fifty* percent of cost, respectively. *See Subsidies*, 18 Geo.Wash.J. of Int'l Law & Economics at 309–310. Here, energy is alleged to be 6.7 percent of production costs.

As previously noted, in response to ITA's uniform decisions that no countervailing duties resulted from the Mexican gas pricing policies, legislation was introduced and defeated which would have made subsidies for natural resources countervailable where certain requirements were met, such as substantial use. The debate on the issue showed greatly divergent views on whether this type of subsidy was "unfair."[7] Yet this is exactly the question PPG now puts to this court to decide by judicial fiat. While the ITA might in its discretion have defined "specific" to include as a category, "energy-intensive" industries, perhaps with guidelines, it has not done so. Disproportionate use is, under the ITA's specificity standard, a factor to be considered but is not in and of itself controlling. *See supra* at 1576–77. In the absence of clear directions from Congress, it cannot be said that the ITA's failure to make "energy-intensive" into a "specific" group of industries within the meaning of section 1303 is unreasonable, much less an abuse of discretion.

## VI

### Conclusion

The decision of the Court of International Trade that the Mexican government FICORCA program and natural gas programs are not countervailable on imports of float glass is

AFFIRMED.

SMITH, Senior Circuit Judge, concurs in the result.

MICHEL, Circuit Judge, dissenting.

I respectfully dissent.

Affirming this final countervailing duty determination, as my two esteemed colleagues have voted to do, threatens to revive an old International Trade Administration ("ITA") interpretation of the statute's specificity requirement previously abrogated under settled law. Indeed, ITA itself abandoned this misinterpretation five years ago after its "general availability test" was rejected by the Court of International Trade ("CIT") in *Cabot Corp. v. United States*, 9 CIT 489, 620 F.Supp. 722 (1985). Ever since, both the administering agency and the specialized trade court have agreed that the former ITA interpretation was incorrect, as well as on what the correct test is. The CIT has remanded cases in which ITA applied its old interpretation. Finally, this old interpretation clearly contravenes Congressional purpose as expressed by Congress itself, which explicitly disap-

---

7. *See Subsidies*, 18 Geo.Wash.J. of Int'l Law & Economics at 320. The debate continues to rage. *See* D. Nance, *Natural Resource Pricing Policies and the International Trading System*, 30 Harv.Int'l L.J. 65 (1989).

proved it in 1988, while approving the new test ITA uses today.

In this case, however, instead of exercising discretion to determine if the discount gas sales to the defendant float glass manufacturers constituted a bounty or grant by applying the correct test to the facts, ITA declined to investigate the relevant facts and simply defined the subsidy out of existence with its old, statutorily incorrect general availability test. Therefore, this is not an appeal that can properly be resolved by deference to agency discretion.

While I believe this appeal is resolved with the wrong result, my greater concern is that this affirmance threatens to unsettle the law. Since this is our first decision in an appeal on the question, its unsettling effect may be compounded. Nor is concern lessened because there is no opinion of the court and hence no opinion with precedential force. Since Senior Judge Smith, while voting to affirm the CIT result, did not join in Chief Judge Nies' opinion, she speaks only for herself, just as I speak only for myself. This jurisprudential truth, however, likely will be lost when the bar reads and cites that opinion. After all, facts and reasons are described and a two-judge result is noted; together, they imply a precedential holding.

The result here conflicts not only with the "specificity" requirement of the 1979 statute as expressly and definitively construed by ITA and CIT, but also with the result in every *other* ITA investigation and CIT decision since 1985. It is a result based on an agency analysis that clearly did not measure the "case by case effect of benefits provided to recipients"—here, the discount natural gas sales—as *Cabot* and the other authorities explicitly require. *See* 620 F.Supp. at 732.

On the contrary, ITA applied *only* a "general availability" of benefits test, which Chief Judge Nies agrees is statutorily incorrect. Although there is a suggestion it relied on a "nominal general availability" analysis, clearly, ITA relied *only* on price, determining it was the same for all. That is the very definition of a generally available benefit. Nominal availability

was never an issue in this case as all other industries not only can but actually do buy the discount gas at the uniform, published price. Nor, in any event, has the *Cabot* test been limited by CIT to piercing *nominal* general availability. Certainly, Judge Carman in *PPG Industries* itself does not rely on any such limitation, as he did, properly, in *Cabot* where only three companies could even use the heavy fuel nominally available to all companies.

Similarly, there is a suggestion that this case presents the dichotomy between *de jure* and *de facto* analysis. Since under the program the gas sales are made to all industries, however, this case involves only *de facto* analysis. The true issue here is not whether *de facto* analysis is required but what such a case by case analysis includes.

The CIT has answered that question. However, by affirming in this appeal, our court weakens a six-year consistent line of CIT cases, starting with *Cabot*, to which *PPG Industries* is the sole exception. These cases hold that ITA must look beyond general availability and must assess the "effect of benefits" on the "recipients" on a "case by case" basis, particularly whether the subsidies disproportionately benefit a foreign company or industry compared to others there, thereby creating a significant "competitive advantage" over companies here. The mandate of *Cabot* is clear: ITA is required to undertake a factual investigation comparing the *effects* of the benefit on the foreign party named in the petition with those on other recipients of the same subsidy. *Cabot*, 620 F.Supp. at 732 ("The appropriate standard focuses on the *de facto* case by case effect of benefits.").

The logic of this reasoning is undeniable.

Even in *PPG Industries*, the sole aberration, the CIT (Carman, J.) started from the same premise, *i.e.*, that to avoid

the absurdity of a rule that transforms an obvious bounty into a non-countervailable benefit by making the program "generally available" ... the appropriate standard [must focus] on the *de facto case by case effect of benefits provided*

to *recipients* rather than on the nominal availability of benefits.

*PPG Indus., Inc. v. United States,* 11 CIT 344, 662 F.Supp. 258, 265 (1987) (quoting *Cabot Corp.,* 620 F.Supp. at 732) (emphasis added in part). As a result, at least where, as here, benefits are not just nominally available to but are actually received by many, other factors must be considered:

> Although general availability may be a manifestation that a program has not conferred a benefit upon a specific recipient, *general availability is not the statutory test.* It is merely one of *several relevant factors* to be considered in determining *whether or not a benefit or competitive advantage has been conferred* upon a "specific enterprise or industry, or group of enterprises or industries."

*Id.* (citation omitted) (emphasis added). This multi-factor test, based on *Cabot,* also written by Judge Carman, has been consistently followed by the CIT. *See, e.g., Roses, Inc. v. United States,* 743 F.Supp. 870 (Ct. Int'l Trade 1990); *Armco Inc. v. United States,* 733 F.Supp. 1514 (Ct.Int'l Trade 1990); *Comeau Seafoods Ltd. v. United States,* 724 F.Supp. 1407 (Ct.Int'l Trade 1989).

In *Cabot* itself, Judge Carman explained that even

> *generally available benefits,* when actually bestowed, may constitute specific grants *conferred upon specific identifiable entities,* which would be subject to countervailing duties.

*Cabot,* 620 F.Supp. at 731 (emphasis added in part). Gauging whether countervailable benefits are "actually bestowed" and "grants conferred" requires first, an inquiry whether the benefits are "specific [and] quantifiable" and can be traced to "specific identifiable entities," "specific industries" or a "specific class." *Id.* at 731–32. The *Cabot* test next requires "determining if [the subsidy] amounts to an additional benefit or competitive advantage." *Id.* at 732. If so, the program likely is countervailable under the statute. *Id.*

But none of these *Cabot* inquiries was made here.

Nevertheless, the government argues that this test "has always been applied [by ITA] in the same manner." Indeed, as ITA itself acknowledged in 1986 (post-*Cabot*) in *Certain Softwood Lumber Products from Canada,* 51 Fed.Reg. 37453, 37456 (1986) (Preliminary Affirmative Countervailing Duty Determination), it must conduct a *multi-factor* test of effects, which may include an examination, as PPG insists was necessary here, of disproportionate beneficiaries or dominant users. In 1989, ITA further acknowledged that in determining whether a domestic program was countervailable, consideration must be given to "whether certain enterprises, industries, or groups thereof receive disproportionately large benefits under a program." *Countervailing Duties,* 54 Fed.Reg. 23366, 23379 (1989) (Proposed Rules). Answering that question can only require comparing the effects of the subsidy on one foreign company or class with those on another. Indeed, it is clear that in some cases a program may so disproportionately benefit a single company or class that on that factor alone, a countervailable subsidy could be found. Thus, in individual cases, disproportionate benefit can indeed be "in and of itself controlling." In its 1984 final determination, on which this appeal is based, however, ITA explicitly failed to make such a comparison, or, indeed, to inquire beyond general availability:

> We verified that the float glass companies paid the published price for natural gas which was available to all industries, *and therefore* received no benefit.

*Unprocessed Float Glass From Mexico; Countervailing Duty Determination,* 49 Fed.Reg. 23097, 23099–100 (1984) (emphasis added) (Final Affirmative Countervailing Duty Determination). Thus, contrary to the government, this test has *not* "always been applied in the same manner." In fact, before *Cabot* in 1985, it was never applied. This investigation was pre-*Cabot.*

It is suggested that ITA needed only to investigate PPG's charge of preferential pricing and when that charge was shown to

be untrue, needed do nothing more. But PPG also charged that *published* price was a countervailable subsidy to these defendant float glass manufacturers as individual companies and also as members of a larger class. PPG then does *not* argue that the subsidy is countervailable "based merely on the recipients of the subsidy being identifiable." Thus PPG does indeed seek reversal as a matter of fact as well as law. Moreover, under the statute, PPG has no burden of proof. Therefore, once PPG's petition was accepted, ITA was obliged to investigate the facts that are relevant under the statutory test. Here, it declined to do so.

Despite quoting *Cabot*'s requirement that ITA assess the "case by case effect of benefits provided to recipients," *PPG Indus.*, 662 F.Supp. at 265, the CIT, in reviewing ITA's final determination in *PPG Industries*, concluded, illogically, that "[s]ince the ITA determined [that the float glass manufacturers] paid the *published price* for natural gas which was *available to all* industries, ... ITA's determination was in substantial accordance with the statutory standard." *Id.* at 272 (emphasis added). Yet, Judge Carman himself says earlier in *PPG Industries* that general availability "is *not* the statutory test." *Id.* at 265 (emphasis added). Thus, like Chief Judge Nies, Judge Carman addressed only the preferential pricing allegations of PPG's ITA petition and CIT complaint, while ignoring the allegation that sales to these defendants at the published price were themselves a countervailable subsidy.

Nor may ITA properly rely in this case on its earlier determination in *Anhydrous and Aqua Ammonia from Mexico*, 48 Fed. Reg. 28522 (1983) (Final Negative Countervailing Duty Determination). There, ITA determined that no countervailable subsidy existed *solely* on the ground that:

> [s]ince all industrial users of natural gas can obtain this good *at the same price*, gas is not provided to a "specific enterprise or industry, or group of enterprises or industries" under section 771(5)(B) of the Act.

*Id.* at 28524 (emphasis added). Thus, there too ITA plainly failed to look beyond general availability, but merely confirmed that the defendant manufacturers paid the same energy price as all other industries in Mexico. That analysis was as defective as this one and for the same reason: Instead of investigating, ITA defined the issue away. Nor, as the other opinion suggests, did PPG have some burden to come forward with "additional information ... to cause ITA to review" its original determination that the natural gas program was "not countervailable as a general proposition," since that determination was based entirely on an incorrect statutory interpretation, and since PPG as petitioner has no burden to plead specific effects on defendants anyway. Similarly, PPG had no burden to prove that defendants were part of a "class" of "energy-intensive" industries, for it had alleged that these defendants, as individual enterprises, received a countervailable benefit. Nor was PPG required to somehow equate the defendant float glass manufacturers with "*de facto* sole recipients" in other countervailing duty cases. Under *Cabot*, all PPG was required to do was identify the company or class allegedly receiving the countervailable benefits. Whether or not, under a "case by case" analysis, a class including defendants is "comparable" (in size) with the three-company class in *Cabot* is irrelevant. Moreover, to reason, as the other opinion does, that ITA need not review a program because in a prior determination the program was found "not countervailable as a general proposition," clearly contravenes the rationale behind *Cabot*'s "case by case" requirement.

Since ITA plainly did not apply to defendants here a "specificity analysis," measuring the "case by case effect of benefits provided to recipients," to affirm its determination is wrong as a matter of law. Moreover, our affirming the CIT's erroneous holding in *PPG Industries* undermines subsequent CIT holdings, which uniformly and correctly applied the *Cabot* test.

For example, in *Roses*, Judge Restani specifically applied *Cabot* to overturn the ITA determination, holding that:

[T]he appropriate test in the current investigation should have been *whether a competitive advantage in fact was bestowed* on a specific enterprise or industry, or a group thereof, by the program at issue. Thus, the general availability rule under which ITA conducted the investigation was flawed.

*Roses*, 743 F.Supp. at 879 (emphasis added). Similarly, in *Armco*, the court, applying *Cabot*, reversed ITA's determination that a depreciation program was noncountervailable because it was available to all industries depreciating similar assets. Such an analysis, the court explained, "misses the point":

> [I]f a particular benefit did constitute an unfair, countervailable subsidy when granted to a certain company or companies, the fact that other companies were also eligible for the benefit, or even that other companies also utilized the benefit, would not, as the *Cabot* Court pointed out, change the fact that the benefit was unfair, and thus countervailable, when granted to the first company.

*Armco*, 733 F.Supp. at 1530 (emphasis added). To the same effect is *Comeau Seafoods Ltd.*, 724 F.Supp. at 1414 ("[T]he test is a *de facto* case by case analysis of the benefits conferred.").

What vitality will those and similar CIT decisions have in view of our court's result in *PPG Industries?*

Finally, ITA's incorrect determination, based on a statutorily incorrect test, contravenes the clear intent of Congress, which has adopted the *Cabot* "effect of benefits" test as reflective of its original intent. Congress amended section 1677(5)(B), originating in 1979, in the Omnibus Trade and Competitiveness Act of 1988, adding a "Special Rule":

> In applying subparagraph (A) [which includes the specificity language], the administering authority, in each investigation, shall determine whether the bounty, grant, or subsidy in law or in fact is provided to a specific enterprise or industry, or group of enterprises or industries. Nominal general availability, under the terms of the law, regulation, program, or rule establishing a bounty, grant, or subsidy, of the benefits thereunder is not a basis for determining that the bounty, grant, or subsidy *is not, or has not been, in fact provided to a specific enterprise or industry, or group thereof.* (Emphasis added).

The legislative history, moreover, clearly indicates that Congress explicitly endorsed the test required in the *Cabot* case, H.R. Rep. No. 40, Comm. on Ways and Means, 100th Cong., 1st Sess. (H.R.Rep. No. 40), at 123–24 ("This [amendment], in effect, codifies the finding of the [CIT] decided in *Cabot Corp. v. United States*.... The test ... is whether there is a sufficient *degree of competitive advantage* in international commerce being bestowed upon a discreet class of beneficiaries that would not exist *but for* government action." (emphasis added)). The purpose in enacting the Special Rule was not to change existing law, but to ensure that ITA properly applied the 1979 statute. According to the House Committee Report, ITA "had been interpreting the concept of 'specificity' and 'general availability' in an unduly narrow manner." *Id.* at 123. The *Cabot* test "provide[s] a sound interpretive rule to be applied in those cases where broadly available benefits are at issue." *Id.* at 124. The Special Rule, by endorsing the *Cabot* test, therefore, simply "clarifies the application of the countervailing duty law to domestic subsidies." Conf.Rep. No. 576, Omnibus Trade and Competitiveness Act of 1988, 100th Cong., 2d Sess. at 587. Thus, as of 1989, both Congress in its Special Rule and ITA in its Proposed Rule set forth the correct test, which is presently applied. But the correct test was not applied here, so our decision here needlessly casts doubt upon whether it is indeed correct or required.

It is suggested that Congress, in adopting the clarifying Special Rule, only adopted a "portion" of *Cabot*. Nothing could be more clearly not so, as the above quotations demonstrate. It is also suggested that defeat in 1984 of an amendment to make natural energy subsidies *per se* countervailable proves that Congress'

intent in 1979 on specificity could not cover energy subsidies even when the facts of the case warrant. The illogic of equating a *per se* rule of countervailability and a fact-based discretionary rule needs no elaboration. In any event, in adopting the Special Rule, Congress explicitly envisioned it being used in situations where natural energy, natural gas in particular, was the generally available benefit in question. H.R. Rep. No. 40 at 124.

Rather than upholding this incorrect determination, this court should insist that ITA apply the correct statutory test. Moreover, since the failure to assess the effects of these gas sales or look at anything more than general availability was clearly not harmless error, remand is our only proper course. Indeed, remand has been ordered in every CIT case where ITA had failed to apply the *Cabot* test, *except* in *PPG Industries. See, e.g., Roses,* 743 F.Supp. at 881 (on remand, ITA cannot rely on "its flawed 'general availability' test"); *Armco,* 733 F.Supp. at 1529–30 (remand necessary because ITA conducted only a general availability inquiry); *Cabot,* 620 F.Supp. 722 (remand required for the same reasons). The result here should likewise be a remand.

At the very least, I would have hoped our decision would not have confused the correct interpretation of the specificity requirement. Regrettably, its clarification will have to await another day and perhaps another case.